Ruth J. JEFFERSON et al.

v.

Burton G. HACKNEY et al.

Maria T. DAVILA et al.

v.

Burton G. HACKNEY et al.

Civ. A. Nos. 3–3012–B, 3–3126–B.

United States District Court
N. D. Texas,
Dallas Division.

July 31, 1969.

James A. Martin, Asst. Regional Atty. HEW, Dallas, Tex., amicus curiae for HEW, Martha Joe Stroud, Asst. U. S. Atty. for Northern Dist. of Texas, Dallas, Tex., Robt. C. Mardian, Gen. Counsel HEW, Washington, D. C., Harold J. Stafford, Regional Atty. HEW, Dallas, Tex., of counsel.

Edward Sparer, New Haven, Conn., Carl Rachlin, New York City, Ed Polk, Dallas, Tex., Lonnie Duke, San Antonio, Tex., for plaintiffs, Melvin N. Eichelbaum, San Antonio, Tex., Douglas Larsen, and G. William Baab, Dallas, Tex., of counsel.

Hawthorne Phillips, Exec. Asst. Atty. Gen. of Texas, Pat Bailey, Asst. Atty.

Gen. of Texas, of counsel; Crawford C. Martin, Atty. Gen. of Texas, Nola White, first Asst. Atty. Gen. of Texas, J. C. Davis, W. O. Shultz, Asst. Texas Attys. Gen., W. V. Geppert, Staff Asst., Austin, Tex., for defendants.

Before GOLDBERG, Circuit Judge, and HUGHES and TAYLOR, District Judges.

PER CURIAM:

There are here involved two similar cases. The defendants in both cases are Burton G. Hackney, Commissioner of Public Welfare of the State of Texas, certain members of the State Board of Welfare and certain officials of the State Department of Public Welfare. In one case the Plaintiffs are Maria T. Davila and Jo Ann Guttierez and in the other Ruth Jefferson, Emma Gipson and Jose Apalinor Vasquez. Plaintiffs sue individually, on behalf of their minor children, and on behalf of all other parents, relatives or minor children similarly situated.

Prior to September 1, 1968, the Texas State Department of Public Welfare, hereinafter referred to as Department, had maximum limits for recipients of Aid to Families with Dependent Children (AFDC) depending on the number of children in the family. Effective September 1, 1968, the Department reduced each such maximum across the Board by an amount of $12.00. The original suit filed by Jefferson, et al, sought to have that decision held void and to restrain the Department from making any future and similar cuts.

On March 9, 1969, the Department announced the implementation of a new plan E–430 and E–434 to be effective May 1, 1969, under which the grants to AFDC recipients were reduced 50%. There was no reduction in any other welfare program.

As a result of this action by the Department, Davila and Guttierez filed their action in the Western District of Texas seeking: (1) a declaratory judgment voiding that part of the new regulation reducing the AFDC grants, (2) an injunction to restrain the implementation of the regulation which restricts the amount of assistance for AFDC recipients to a percentage of unmet budgetary need which is less than that granted to recipients in other categories, and (3) an injunction prohibiting payments of assistance less than unmet budgetary needs. Jefferson, et al, amended their complaint which had been filed in the Northern District to seek similar relief. On motion of the defendants the two actions were consolidated in the Northern District of Texas.

At the beginning of the hearing on the merits, a motion was filed by the defendants to dismiss Ruth Jefferson as a party plaintiff for the reason that she was not a needy person eligible to receive AFDC benefits nor was she representative of the class of individuals receiving AFDC benefits.

It appears that the parties stipulated that Ruth Jefferson was the mother of five children who live with her at her place of residence, that she and her children have no regular income, resources, support or maintenance other than the $120.00 per month public assistance payments and agricultural commodities received from the U. S. Department of Agriculture. She also receives spasmodic assistance in the form of money from the Orleans Fund and has worked on brief occasions. (Stipulation No. 3). In her deposition taken on April 23, 1969, Ruth Jefferson testified that she was receiving AFDC benefits at the time this suit was filed (February 12, 1969) and is presently still receiving them. At the hearing on July 1, 1969, it was admitted by defendants that she had not been removed from the AFDC rolls.

It is our opinion that under these circumstances Ruth Jefferson is a proper party plaintiff and representative of the class of persons receiving AFDC benefits. The motion to dismiss is denied.

This Court does not pass on the eligibility of Ruth Jefferson to receive AFDC benefits. That matter is within

the jurisdiction of the State Department of Public Welfare and we leave it to the Department for its determination.

Before discussing the issues in this case we will next briefly review the relevant federal and state welfare provisions.

## I.

### HISTORY

In 1935 Congress provided for various categories of Public Welfare.[1] Under the Old Age Assistance (OAA) program, as presently constituted, grants are authorized "for the purpose of enabling each State to furnish financial assistance to needy individuals—(and) medical assistance on behalf of aged individuals." Under the Aid to the Blind (AB) and Aid to the Permanently and Totally Disabled (APTD) programs, grants are likewise authorized to "needy individuals" in each category. The statute authorizing grants for Aid to Families with Dependent Children (AFDC) provides that it is "for the purpose of encouraging the care of dependent children in their own home."

Under each category provisions have been made for the states to implement the programs by submitting plans and matching funds. If the state elects to participate in one or all of the programs, the federal government supplies part of the monetary requirements after the state plan has been approved by the Secretary of Health, Education and Welfare. There is no mandatory requirement that such a program be established, or once established, that it be continued.

The Texas Constitution, Vernon's Ann.St., originally prohibited any welfare grants,[2] and this provision has been retained as Section 51 of Article III of the Constitution from the date of its adoption in 1876 to the present time.

Provision for payment of grants to individuals has been made by amendments to the Constitution in the form of exceptions to the prohibition.

In 1935 section 51–b of Article III was added so as to authorize Old Age Assistance to "actual bona fide citizens of Texas who are over the age of sixty-five (65) years * * *"

This amendment was followed in 1937 by the adoption of 51–c to provide assistance to the needy blind and by adoption of Section 51–d which grants assistance "to destitute children under the age of fourteen (14) years."

In 1945 Sections 51–b, 51–c, and 51–d were consolidated into Section 51–a of Article III. In 1956 Section 51–b–1 was adopted providing Aid to the Permanently and Totally Disabled.

These amendments as well as others adopted for needy persons provided for maximum grants in each of the various categories and set a dollar ceiling on the amount that could be paid for all welfare programs out of state funds. From time to time the maximums and the ceiling were increased.

An amendment, adopted in 1963, combined Sections 51–a and 51–b–1 into Section 51–a and raised the ceiling for all programs from $52,000,000.00 to $60,000,000.00.

In 1965 Section 51–a was again amended to provide medical assistance in addition to grants to the four categories. The $60,000,000.00 ceiling was retained, but no maximums were set. In 1968, an amendment proposed to raise the ceiling from $60,000,000.00 to $75,000,000.00 was defeated by the voters of Texas.

Under the present Constitutional provision the amount to be appropriated for each category is left to the Legislature. In House Bill No. 5, 60th Legislature,

---

1. Old Age Assistance (OAA) 42 U.S.C. Sec. 301 et seq., Aid to Families with Dependent Children (AFDC) Sec. 601 et seq., Aid to the Blind (AB) Sec. 1201 et seq., Aid for the Permanently and Totally Disabled (APTD), Sec. 1351 et seq.

2. Section 51 of Article III provided that the Legislature " * * * shall have no power to make any grant or authorize the making of any grant of public moneys to any individual, * * * whatsoever."

First Called Session, the Legislature appropriated $48,000,000.00 for Old Age Assistance, $1,400,000.00 for the Needy Blind, $4,250,000.00 for the Permanently and Totally Disabled and $6,150,000.00 for Families with Dependent Children.

## II.

### ISSUES

We now turn to the issues.

The issues presented are:

1. Is the payment of only 50% of unmet budgetary needs to recipients of AFDC in contrast to the payment of 95% to 100% of need to other welfare recipients violative of the Equal Protection Clause of the Fourteenth Amendment?

2. Is the payment of a lesser percentage to AFDC recipients vis-a-vis other welfare recipients the result of racial or ethnic prejudice and violative of federal civil rights enactments or the Equal Protection clause?

3. Does the present AFDC plan in Texas violate the requirements of § 402 (a) (23) of the Social Security Act?

## III.

### EQUAL PROTECTION

#### A. NEEDS

■ We first consider whether the payment of only 50% of unmet budgetary needs to recipients of AFDC in contrast to the payment of 95% or more of need to other welfare recipients is violative of the equal protection clause of the Fourteenth Amendment.

In determining grants for needy persons, the Texas Department of Public Welfare sets a "Standard Budgetary Allowance" schedule providing like amounts in all categories for personal needs such as housing, utilities, laundry, etc. There may be differences in such allowances when differences in need exist (e. g., different amounts for housing as per the size of the family, special allowance for maintenance of seeing eye dogs, etc.), but it is not contended by plaintiffs that there is discrimination in the computation of the budgetary allowance. It is contended, however, that AFDC recipients are the victims of discrimination in receiving only 50% of their computable needs.[3]

■ We begin with the observation that needy persons cannot claim monetary relief as a vested right. In the case of Sweeny v. State Board of Public Assistance, 36 F.Supp. 171 (M.D.Pa. 1940), affirmed, 119 F.2d 1023, 3 Cir. 1941, cert. denied, 314 U.S. 611, 62 S.Ct. 74, 86 L.Ed. 491, the Court stated:

"Relief or public assistance is not a vested property right held by any person or group of persons: Russell v. City of Providence, 7 R.I. 566. It is a gratuity from the state made to those whose status and condition measured by standards promulgated by the State Board of Public Assistance show an urgent need for financial aid * *."

---

3. As an example plaintiff develops a table comparing an OAA recipient with one minor child to an AFDC recipient with one minor child.

| | OAA | AFDC | |
|---|---|---|---|
| Adult's Personal Needs | $65.00 | $65.00 | |
| Child's Personal Needs | 25.00 | 25.00 | |
| Housing | 42.00 | 42.00 | |
| Total allowable needs | $132.00 | $132.00 | |
| 50% Reduction application to AFDC only | | 66.00 | |
| | $132.00 | $ 66.00 | |
| Outside Income | | | |
| (Social Security deducted with $5.00 credit) | 45.00 | 50.00 | (Child support deducted) |
| TOTAL PAYABLE BENEFITS | $ 87.00 | $ 16.00 | |

Plaintiffs do not dispute this proposition. They do contend, however, that once Texas has undertaken to provide assistance, it cannot discriminate between recipients in the various welfare categories. Plaintiffs argue that there is but one welfare program with the one purpose of giving assistance to the needy. Paying only 50% of unmet budgetary needs to AFDC recipients, while paying 95% to 100% to other recipients is, according to plaintiffs, an invidious discrimination violative of the Equal Protection clause of the Fourteenth Amendment. We must disagree.

If one looks only at the amount of the grants provided for in each welfare category, there does appear to be discrimination against AFDC recipients, but the size of grants alone is not decisive of the constitutional questions before us. The critical question is not whether differences in grants exist, but whether such differences are irrational under the circumstances and therefore constitutionally impermissible. To answer this question, we must look to the structure and purposes of the Social Security Act and its various programs.

Plaintiffs contend that the only purpose of public welfare is the satisfaction of financial need. While this certainly is one of its purposes, the various programs established under the Social Security Act clearly indicate that other more diverse purposes are also present. It is these additional purposes which justify in large measure the difference in financial assistance accorded recipients in the various welfare programs. Under this view, the difference in grants between programs merely reflects the fact that disparate purposes call for dissimilar solutions.

By way of illustration we note a significant difference in emphasis between the three non-AFDC programs and Aid to Families with Dependent Children. In the non-AFDC programs, the emphasis is primarily on the creation and the retention of the ability for self-care. Thus the OAA program furnishes financial assistance for "rehabilitation and other services to help individuals * * * attain or retain capability for self-care * * *" 42 U.S.C.A. § 301. Similar provisions appear in 42 U.S.C.A. § 1201 and § 1351 establishing the AB and APTD programs respectively. AFDC, on the other hand, is designed primarily to maintain and strengthen family life. 42 U.S.C.A. § 601 thus provides assistance:

"For the purpose of encouraging the care of dependent children in their own homes or in the homes of relatives by enabling each State to furnish financial assistance and rehabilitation and other services * * * to needy dependent children and the parents or relatives with whom they are living to help maintain and strengthen the family life and to help such parents or relatives to attain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection * * *."

In the recent case of Lampton v. Bonin, E.D.La., 1969, 299 F.Supp. 336, the Court was faced with the same issues as here. In disposing of the argument that the four programs are in conception and purpose but one program, the Court said:

"The primary purpose of ADC [AFDC] appropriations, unlike appropriations for the other three categories, is not simply to enable the states to furnish assistance to needy children. True, these funds are to be used for this purpose, but the enabling of states to furnish assistance to needy children is only a means to the real primary purpose; "the purpose of encouraging the care of dependent children in their own homes or in the homes of relatives * * * to help maintain and strengthen family life * * *." It is not enough that dependent children be given simply financial assistance; the chief purpose of the Social Security Act section on dependent children is to see

that such children are raised by their parents or relatives in a family atmosphere. Plaintiffs point out that in 1935, when the Social Security Act was enacted, the primary statutory purpose of ADC [AFDC] was simply to enable states to furnish financial assistance to needy children. But we must consider the Social Security Act as it exists today, not as it was written thirty-four years ago.

Furthermore, we cannot agree with plaintiffs that the four categories of public assistance found in the Social Security Act "are in conception, purpose and operation but one program with four groups of beneficiaries * * *." Although the four categories may have some common provisions and objectives, each category is embodied in a separate title of the Social Security Act. Each of these titles is different from the others. Each title calls for a state plan for one category only, which state plan is to be independent of the plans under the other titles. A state plan for each category must be approved by the Secretary of Health, Education and Welfare if it meets the requirements of its title. Section 404(a) of the Social Security Act, 42 U.S.C. § 604 (a) provides that if the Secretary disapproves of a state plan on the Aid to Families with Dependent Children program, he must withhold federal payments to the state for that category or limit payments to parts of that particular state plan not affected by the disapproval. There is nothing in Section 404(a) which would authorize the consequences of nonconformity of this plan to be applied to any other plan.

Even more damaging to plaintiffs' argument was the enactment of Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1385, in 1962. Up until that time it was impossible to have a common plan for any of the four categories. But then Congress enacted Title XVI, which authorized states, at their option, to have a single plan for public assistance to the aged, blind, and disabled, in lieu of the three separate plans under Titles I, X, and XIV, the titles dealing with aid to these individuals. But it is most significant that while Congress considered the three adult categories similar enough to permit the states to adopt a common plan for them, it did not include Aid to Dependent Children in Title XVI, so that states must still keep the ADC [AFDC] plan and program separate, even if they combine the other three categories into one plan."

We are of the opinion that each of the titles of the Social Security Act dealing with the four categories here involved stands alone. The State may exercise its powers independently for each of the programs and have different levels of payment for each program without running afoul of the Fourteenth Amendment. This conclusion is not affected by the fact that Texas, in establishing standards of need, has defined the needs of the recipients in the four welfare categories as the same. Plaintiffs argue, in effect, that whatever differences may have existed between the needs of recipients in the various categories has been obliterated by this legislative action. The problem with this argument is that an identity of needs does not obscure the differences in the purposes and functions of the various programs. Welfare programs do not all tend toward the same social objective. Self-help for the aged, blind and disabled may indeed pose a more pressing social problem than strengthening family life among recipients of AFDC. This question is for the Legislature. Differing purposes beget dissimilar remedies. There remain priorities in time and functions in alleviating human misery. Unless the Constitution mandates that all human needs be met, we must accept classifications and piecemeal solutions which are not egalitarian between all programs and all human beings.

For the foregoing reasons we hold that the payment of only 50% of unmet

budgetary needs to recipients of AFDC as against 95% to 100% of need to other welfare recipients is not violative of the Equal Protection clause of the Fourteenth Amendment. As said in Morey v. Doud, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957):

"'1. The equal protection clause of the 14th Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and voids what is done only when it is without any reasonable basis and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety, or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary.' Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78–79, 31 S.Ct. 337, 340, 55 L.Ed. 369."

The Texas Legislature was confronted with a ceiling of $60,000,000.00 to be spent for the four categories of public welfare. No more than that amount could be appropriated by the Legislature and it was the duty of the Legislature to use its judgment in the manner and the amount the available money should be divided.

In making the appropriation for the present biennium the Legislature could have considered numerous factors. The

purpose, as set out in the Social Security program, for which grants are made to recipients in each category is a primary consideration. Legislators might well have considered the difference in health requirements of the aged, blind and permanently disabled as well as their inability to care for themselves and their unemployability. Of the four groups women with children are most likely to be able to work. Mothers having the care of young children frequently do work and receive no outside assistance. The Legislature might have considered that many mothers could work and would do so with some assistance which would enable them to keep their children in the home, particularly at this time when workers are sorely needed. The Legislature might also have thought they should be encouraged "to attain * * * capability for the maximum self support and personal independence * * * as provided in the Act authorizing the AFDC program." [4]

Considering the different purposes of programs in the Social Security Act and the differences in the capacity for self-help among recipients in the various categories, we cannot say that the action of the Legislature in providing less assistance for AFDC recipients than for the other recipients of welfare was "without any reasonable basis and therefore * * * purely arbitrary." Morey v. Doud, *supra*.

## B. ETHNICITY AND RACE

Plaintiffs' next contention is that the discrimination against the AFDC recipients vis-a-vis other welfare recipients is the result of racial or ethnic prejudice and is violative of the Equal Protection Clause of the Fourteenth Amendment and a violation of the federal civil rights enactments.[5]

4. According to Stipulation 90 about ½ of the caretakers are too uneducated or handicapped to hold even the lowest paid jobs. This fact, however, may not have been known to the Legislators.

5. 42 U.S.C. sec. 2000d provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, or denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

Plaintiffs point to past policies in Texas as evidence that the reductions in AFDC benefits were racially discriminatory. Plaintiffs specifically point to the "man in the house" policy prior to the decision in King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), and the "suitable home" policy designed to exclude children because of their mother's allegedly improper behavior.

As evidence of present discrimination plaintiffs point to the state appropriations for 1968. The OAA program was allocated $48,162,898.76 for 229,654 recipients, while AFDC was allocated $6,149,427.73 for 138,942 recipients, more than 6 times the funds for less than twice the number of the recipients.

The plaintiffs contend that the difference in the appropriations for AFDC and the other groups is violative of the Equal Protection Clause because there is a larger percentage of Negroes and Mexicans in AFDC than in the other categories.[6]

Plaintiffs contend that in order to remove the discrimination between categories, recipients of AFDC should receive 95%–100% of unmet needs. They seek to have Section 51–a Article III of the Texas Constitution held unconstitutional because it sets a limit on the amount of funds that the Legislature may expend on the various welfare programs. However, if the provisions of Section 51–a were declared invalid, the entire program of welfare would be destroyed, since this section is the only authorization which the Legislature has to appropriate money for the needy. Should this authorization be declared invalid, then 51–a prohibits the Legislature from making any grant of public moneys to any individual. Apparently under this contention plaintiffs desire this Court to take over the responsibilities of the people to amend the Constitution and of the Legislature to allocate funds. This we do not intend to do.

To remove the alleged discrimination, however, it would not be necessary to pay 100% of unmet needs. It would be necessary only to balance the payments to meet like percentages of need throughout the various categories.

We will therefore address ourselves merely to the question of whether there is discrimination between the various categories based on racial or ethnic prejudice. From an examination of the stipulations we have concluded that the plaintiffs have failed to make a sufficient showing of racial or ethnic discrimination.

We have based our conclusions on the following:

1. There has never been a reduction in the amount of money appropriated by the Legislature to the AFDC program. (Stipulation No. 54).

2. Since 1943 there have been five increases in the amount of money appropriated by the Legislature to the

| 6. Program | Year | Percentage of Negroes and Mexican Americans | Percentage of White-Anglos | Number of Recipients |
|---|---|---|---|---|
| OAA | 1969 | 39.8 | 60.2 | 230,000 |
| | 1968 | 38.7 | 61.3 | |
| | 1967 | 37.0 | 63.0 | |
| APTD | 1969 | 46.9 | 53.1 | |
| | 1968 | 45.6 | 54.4 | 4,213 |
| | 1967 | 46.2 | 53.8 | |
| AB | 1969 | 55.7 | 44.3 | |
| | 1968 | 54.9 | 45.1 | 14,043 |
| AFDC | 1969 | 87.0 | 13.0 | |
| | 1968 | 84.9 | 15.1 | 136,000 |
| | 1967 | 86.0 | 14.0 | |

AB and AFDC programs and six increases in the OAA program. (Stipulation Nos. 48 and 49).

3. Since 1959 there have been two increases in the amount of money appropriated by the Legislature to the AFDC program. (Stipulation No. 50).

4. Since 1943 the appropriation by the Legislature to the OAA, AB and AFDC programs have increased by the following percentages:

OAA—211%
AB—200%
AFDC—410%

(Stipulation No. 51).

5. Since 1963 the appropriation by the Legislature to the OAA, AB, AFDC and APTD programs have increased by the following percentages:

OAA—13%
AB—0
AFDC—58%
APTD—183%

(Stipulation No. 53).

6. The majority of the AFDC families having their grant raised on May 1, 1969, were large families and the large family groups receiving AFDC assistance grants are predominately Negro and Mexican-American. (Stipulations Nos. 38 and 39).

7. In January, 1969, the Legislature authorized the expenditure of an additional $350,000.00 in the AFDC program for the fiscal year ending August 31, 1969. (Stipulation No. 72).

8. The Legislature has submitted a constitutional amendment to be voted on in August, 1969, which would authorize the Legislature to appropriate up to $80,000,000.00 for assistance grants in the OAA, AB, APTD and AFDC programs. If adopted, the present plan is to recommend to the Legislature an increase of $11,900,000.00 in the AFDC program which will then permit AFDC recipients to be paid 100% of unmet need. (Stipulation 75).

9. Under the proposed plan for appropriations, if the amendment is adopted, the AFDC program would receive $11,900,000.00 of the $15,000,000.00 in additional funds available to operate the OAA, AB, APTD and AFDC programs. (Stipulation No. 76).

10. Recipients in the AB program being paid 95% of need are 54.2% Negro and Mexican-American and 44.3% white-Anglo. (Stipulations Nos. 23 and 31).

11. The depositions of Welfare officials conclusively establish that the defendants did not know the racial make-up of the various welfare assistance categories prior to or at the time when the orders here under attack were issued.

Under the foregoing undisputed facts we are of the opinion that plaintiffs have failed to make a sufficient showing of racial or ethnic discrimination to require us to declare void under the Equal Protection clause or under the Civil Rights Act of 1964 either the Legislative Appropriations bill or Section 51–a of Article III of the Texas Constitution.

## C—EQUAL PROTECTION STANDARDS

Plaintiffs contend that despite the above enumerated considerations, the Texas Welfare program for AFDC recipients must be declared unconstitutional as presently constituted. They argue that any reasons advanced by the state for unequal treatment of recipients in the various programs must be examined not by traditional equal protection standards, but according to the strict scrutiny standard of certain recent Supreme Court pronouncements. Plaintiffs rely on Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (April 21, 1969); Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968); Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); and Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965), for the proposition that Texas must show a "compelling state interest" to justify unequal treatment of recipients in the various welfare programs. Absent such a compelling state interest, plaintiffs say the present

AFDC allotment is constitutionally insufficient. We cannot agree. Analysis of plaintiffs' cases indicates certain crucial distinctions which make them inapplicable here.

In Shapiro v. Thompson, *supra,* the Supreme Court struck down a Connecticut welfare requirement which made one year's residence in the state a prerequisite to the receipt of public assistance. In finding a denial of equal protection in such a requirement, the Court found that Connecticut had failed to show a compelling state interest for differentiating between residents and nonresidents. Application of the stricter equal protection standard, however, was clearly based on the Court's determination that the welfare requirement placed a burden on the right to travel. The state statute had to be strictly scrutinized only because it impinged on an independently protected constitutional right. In our case, no independent constitutional right of the plaintiffs has been infringed. Plaintiffs merely rely on the asserted denial of equal protection.

Plaintiffs' other cases are inapplicable for similar reasons. In Levy v. Louisiana, *supra,* the strict scrutiny standard was applied because "a basic civil right" was involved and because the statute under review was discriminatory on its face. In Harper v. Virginia Board of Elections, *supra,* and in Carrington v. Rash, *supra,* the statutes there invalidated placed a burden on the constitutional right to vote. The rationale of these cases is consistent with the rule announced in *Shapiro,* and therefore inapplicable here. The Texas welfare laws before us place no burden on any independent constitutional right of the plaintiffs. As already noted, there is presently no constitutional right to welfare assistance. Welfare "is a gratuity from the state made to those whose status and condition * * * show an urgent need for financial aid * * *." Sweeny v. State Board of Public Assistance, *supra.* States consequently have considerable freedom to determine the levels of welfare assistance. As

said recently by the Supreme Court in King v. Smith, 392 U.S. 309, 318, 88 S.Ct. 2128, 2134, 20 L.Ed.2d 1189 (1968):

> "There is no question that States have considerable latitude in allocating their AFDC resources, since each State is free to set its own standard of need and to determine the level of benefits by the amount of funds it devotes to the program."

Our view that plaintiffs' claim must be determined by traditional equal protection standards is fortified by the recent Supreme Court decision in McDonald v. Board of Election Com. of Chicago, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969). The *McDonald* case involved the right of unsentenced inmates of a Cook County jail to appear personally at the polls in order to vote. Chief Justice Warren, writing for a unanimous court, rejected the argument that the compelling state interest theory was applicable. In so concluding, the Court extensively analyzed the two standards of equal protection. In our view that analysis, which we here reproduce, conclusively demonstrates the inapplicability of the stricter standard to the case at bar:

> "Before confronting appellants' challenge to Illinois' absentee provisions, we must determine initially how stringent a standard to use in evaluating the classifications made thereunder and whether the distinctions must be justified by a compelling state interest; for, appellants assert that we are dealing generally with an alleged infringement of a basic, fundamental right. See, e. g., Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). Thus, while the 'States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised,' Lassiter v. Northampton County Board of Elections, 360 U.S. 45, 50, 79 S.Ct. 985, 3 L.Ed.2d 1072, 1076 (1959), we have held that once the States grant the

franchise, they must not do so in a discriminatory manner. See Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965). More importantly, however, we have held that because of the overriding importance of voting rights, classifications 'which might invade or restrain them must be closely scrutinized and carefully confined' where those rights are asserted under the Equal Protection Clause; Harper v. Virginia State Board of Elections, *supra*, at 670, 86 S.Ct. at 1083, 16 L.Ed.2d at 174. And a careful examination on our part is especially warranted where lines are drawn on the basis of wealth or race, Harper v. Virginia Board of Elections, *supra*, two factors which would independently render a classification highly suspect and thereby demand a more exacting judicial scrutiny. Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); McLaughlin v. Florida, 379 U.S. 184, 192, 85 S.Ct. 283, 288, 13 L.Ed.2d 222, 228 (1964).

"Such an exacting approach is not necessary here however, for two readily apparent reasons. *First, the distinctions made by Illinois' absentee provisions are not drawn on the basis of wealth or race. Secondly, there is nothing in the record to indicate that the Illinois statutory scheme has an impact on appellants' ability to exercise the fundamental right to vote.* It is thus not the right to vote that is at stake here but a claimed right to receive absentee ballots. Despite appellants' claim to the contrary, the absentee statutes, which are designed to make voting more available to some groups who cannot easily get to the polls, do not themselves deny appellants the exercise of the franchise; nor, indeed, does Illinois' Election Code so operate as a whole, for the State's statutes specifically disenfranchise only those who have been convicted and sentenced, and not those similarly situated to appellants. Ill.Rev.Stat., c. 46,

§ 3–5 (1968). Faced as we are with a constitutional question, we cannot lightly assume, with nothing in the record to support such an assumption that Illinois has in fact precluded appellants from voting. We are then left with the more traditional standards for evaluating appellants' equal protection claims. Though the wide leeway allowed the States by the Fourteenth Amendment to enact legislation that appears to affect similarly situated people differently, and the presumption of statutory validity that adheres thereto, admits of no settled formula, some basic guidelines have been firmly fixed. The distinctions drawn by a challenged statute must bear some rational relationship to a legitimate state end and will be set aside as violative of the Equal Protection Clause only if based on reasons totally unrelated to the pursuit of that goal. Legislatures are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory classifications will be set aside *only if no grounds can be conceived to justify them.* See McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Kotch v. Board of River Port Pilot Commissioners, 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093, (1947); Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911). With this much discretion, a legislature traditionally has been allowed to take reform 'one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind,' Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563, 573 (1955); and a legislature need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked. See Ozan Lumber Co. v. Union County National Bank, 207

U.S. 251, 28 S.Ct. 89, 52 L.Ed. 195 (1907)." (Emphasis added) ·

## IV.

### SECTION 402(a) (23) OF THE SOCIAL SECURITY ACT.

■ The third issue in this case is whether the present AFDC plan in Texas violates the requirements of § 402(a) (23) of the Social Security Act, 42 U.S.C. § 602(a) (23). This section, which was amended on January 2, 1968, provides in pertinent part that

> by July 1, 1969 the State's standard of assistance for the AFDC program will have been adjusted to reflect fully changes in living costs since such standards were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted.

We do not see how this could mean anything except that the standard of assistance and the maximums imposed must be proportionately raised.

Under the Texas plan in effect on January 2, 1968, there was a maximum on grants paid to recipients of AFDC depending upon the number of children in the family. These maximum limits were as follows:

1 child and caretaker $72.00 per month

2 children and caretaker $93.00 per month

3 children and caretaker $114.00 per month

4 children and caretaker $135.00 per month

Regardless of the number of children in the family $135.00 was the maximum paid. Effective September 1, 1968 there was a cut across the board of $12.00 for each family, so that the maximum regardless of the number of children was $123.00.

On February 28, 1969, Defendants issued a new statewide administrative order known as Executive Letter E–430 and Executive Letter E–434. This order directed that beginning on May 1, 1969, the following changes in Texas welfare procedure were to become effective: 1) the standard of need for AFDC recipients was to be raised 11% to reflect the rise in the cost of living, 2) maximums on AFDC payments were to be removed, and 3) grants were to be calculated by multiplying the newly adjusted standard of need by 50%. The order declared that Texas was unable at the present time to meet any more than 50% of the calculated need of AFDC recipients. Its result was to increase benefits for 14,000 Texas families (the larger families no longer subjected to maximums), decrease benefits for 22,812 families, and totally eliminate 2,470 families from the AFDC rolls. The following is a comparison of the manner in which allowable needs and payable benefits were calculated prior to and after May 1, 1969, when the new plan went into effect. Figures are based on the needs of a family of five, one caretaker and four children:

|  | Old Plan | New Plan |
|---|---|---|
| Adult's personal needs | $ 45.00 | $ 65.00 |
| Children's (4) personal needs | 84.00 | 100.00 |
| Housing | 44.00 | 49.00 |
| Special needs | 5.00 | |
| Total recognizable needs | $178.00 | $214.00 |
| Payable benefits | $123.00 | $107.00 |

As is readily apparent from this table, under the old plan $123.00 was the maximum amount that was paid. Under the present plan, there is a 50% reduction

of the total recognizable needs, resulting in a payment of $107.00, or a $16.00 reduction in payments for a family of 4 children. Despite this reduction, HEW has approved the Texas plan as conforming to the requirements of § 402(a) (23). In approving the plan, HEW was acting pursuant to an administrative regulation which interpreted § 402(a) (23) to mean that a state plan for AFDC must:

> "* * * provide that by July 1, 1969, the State's standard of assistance for the AFDC program will have been adjusted to reflect fully changes in living costs since such standards were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted * * *. In the event the State is not able to meet need in full under the adjusted standard, the State may make ratable reductions in accordance with subparagraph (3) (viii) of this paragraph. Nevertheless, if a State maintains a system of dollar maximums, these maximums must be proportionately adjusted in relation to the updated standards."

After careful examination of the above regulation, and of the Texas plan approved pursuant thereto, we are of the view that neither carries out the intent and purpose of § 402(a) (23). Texas and HEW maintain that the mandate of § 402(a) (23) is satisfied by an increase in the standard of need and a simultaneous reduction in the percentage of need actually paid. They argue, in effect, that the statute is not a command to pay more, but a command to make a bookkeeping entry regarding costs of living increases which would instantly be nullified by the payment of a lesser percentage of the book entry. This is a cipher game. We are of the opinion that Congress intended no such academic exercise. We believe instead that Congress desired to increase the size of grants actually reaching AFDC recipients so as to minimize the effect of the rise in the cost of living. Such an interpretation is more consistent with both the language of the statute and with common sense. As said by Judge Cassibry in Lampton v. Bonin, 299 F.Supp. 336 (E.D.La.1969) (dissenting opinion):

> "ADC [AFDC] payments in all states are predicated upon the need standard; if this standard is increased as section 402(a) (23) requires, the budgetary deficit must also increase accordingly. In those states paying the budgetary deficit in full, as well as in those states that pay only a percentage of the budgetary deficit (or the standard of need) section 402(a) (23) necessarily requires increased ADC [AFDC] grants corresponding to the increase in the standard of need; for a percentage maximum (100 per cent or less), kept constant, automatically translates increased need into an increased payment. Similarly, in those states imposing an arbitrary dollar maximum on the size of the assistance grant, section 402(a) (23) by requiring that the maximums imposed be adjusted in accordance with the change in the cost of living, insures increased grants for all recipients. Regardless of which system of computing ADC [AFDC] payments the state follows, section 402 (2) (23) is therefore designed to effectuate increased ADC [AFDC] recipient grants. The language of the statute could not be any clearer." 299 F.Supp. at 350.

We note that the interpretation of § 402(a) (23) and the Congressional intention behind its enactment have been extensively examined and debated by other courts. Rosado v. Wyman, 304 F.Supp. 1354 (E.D.N.Y.1969), reversed, 414 F.2d 170 (2 Cir., July 16, 1969) (dissenting opinion, Feinberg, J.); Lampton v. Bonin, 299 F.Supp. 336 (E.D.La., April 15, 1969) (hereinafter referred to Lampton I); Lampton v. Bonin, 304 F.Supp. 1384 (E.D.La., July 16, 1969) (hereinafter referred to as Lampton II). In each of these cases judges have disagreed as to the meaning of § 402(a) (23), and have exhaustively analyzed its purpose and derivation. We see no useful purpose in reiterating their arguments here. We

find, however, in Judge Cassibry's opinion in *Lampton II* an excellent survey of the arguments for and against our interpretation of the statute and we therefore adopt it with the exception of the concluding paragraph. The painstaking analysis of the statute there presented is substantially our own. We deem it appropriate, however, to add a few words to the already extensive pages of this debate.

Judge Wisdom, speaking for the Majority in *Lampton II*, has noted that the legislative history of § 402(a) (23) does not seem to indicate that Congress contemplated a large increase in AFDC payments. He observes, among other things, that insufficient attention was paid by Congress to the fiscal implications of mandating increased payments. From this he concludes: "Clearly, no great cost effect was anticipated".

Respectfully, we must disagree. The difficulty with this analysis is that the operative date of the statute (as opposed to its effective date) is July 1, 1969. When the amendment to the statute was passed on January 2, 1968, there still remained 18 months before any increase in payments would be required. The matter of appropriations, therefore, would, in the normal course of events, come before the Congress in the early calendar months of 1969 and was not ripe for consideration in late 1967. Congress does not normally indulge in fiscal prescience.

In support of his position, Judge Wisdom relies on the Summary of Social Security Amendments of 1967, a Committee Print of a Joint Publication of the Senate and House Committees (90th Cong., 1st Sess., December, 1967). He notes that on page 28 of the print, no cost figures appear for AFDC cost of living increases. He argues that this omission supports his position that no increased payments were contemplated.

We read the table as including only those costs which were reasonably predictable. If Table 5 was to be anticipative of all future expenditures under the Act, we cannot perceive why some figure was not included for those states (an estimated number perhaps) that would raise their payments and not merely their standards. Did this table operate on the premise that all states would play the cipher game? A realistic answer might be that expenditures commencing eighteen or more months later in a field of variables do not furnish a fertile basis for legislative projections and thus such projections were not essayed by the authors of the table.

We find nothing in the legislative history of § 402(a) (23) which precludes the interpretation that this amendment was aimed at increased payments. On the contrary, we find that in terms of its language, purpose, and legislative history, § 402(a) (23) requires that Texas, in order to conform to the statute, must adjust upwards its AFDC payments to fully reflect the 11% rise in the cost of living. The basis for such adjustment is the level of payments on January 2, 1968, with appropriate allowance for the Congressional mandate that "maximums be proportionately adjusted." [7]

## V.

## CONCLUSION

While we are dismayed at the comparative compassion involved in granting 100% of need to adults and 50% to children, and while we are disconcerted by the apparent insensitivity in being more concerned with self-help for the aged than food and lodging for the young, we cannot say that these indifferent differentiations are so irrational as to be constitutionally impermissible. A rationale for the distinction exists, unbenevolent though it be.

---

7. It should be noted that the Texas Welfare plan in force on January 2, 1968, had AFDC maximums similar to those in other states which have been held unconstitutional. Williams v. Dandridge, 297 F.Supp. 450 (D.Md.1969); Westberry v. Fisher, 297 F.Supp. 1109 (D. Maine, 1969); Dews v. Henry, 297 F. Supp. 587 (D.Ariz.1969).

We are also convinced that Congress did not see Section 402(a) (23) as a mirage, but rather signaled a hope that the children would be granted the fact of an increased payment and not the fiction of an increased standard.

For the reasons stated we hold that the present AFDC plan (E–430 and E–434) in Texas violates the requirements established by § 402(a) (23) of the Social Security Act and that defendants should be enjoined from implementing such plan.

See also, D.C., 304 F.Supp. 1354, 1356.