ROSADO ET AL. *v.* WYMAN, COMMISSIONER OF
SOCIAL SERVICES OF NEW YORK, ET AL.

No. 540.   Argued November 19, 1969—Decided April 6, 1970

*Lee A. Albert* argued the cause for petitioners. With him on the brief were *Carl Rachlin* and *Martin Garbus.*

*Philip Weinberg* argued the cause for respondents. With him on the brief were *Louis J. Lefkowitz,* Attorney General of New York, *Samuel A. Hirshowitz,* First Assistant Attorney General, and *Amy Juviler,* Assistant Attorney General.

Briefs of *amici curiae* urging reversal were filed by *Alan H. Levine, Melvin L. Wulf, Eleanor Holmes Norton,* and *Martin M. Berger* for the New York Civil Liberties Union et al.; by *Karl D. Zukerman, Dorothy Coyle,* and *Mildred Shanley* for the Catholic Charities of the Archdiocese of New York et al.; and by *Floyd Sarisohn* for People for Adequate Welfare.

Briefs of *amici curiae* were filed by *Solicitor General Griswold, Assistant Attorney General Ruckelshaus,* and *Peter L. Strauss* for the United States, and by *Theodore L. Sendak,* Attorney General, and *Robert A. Zaban,* Deputy Attorney General, for the State of Indiana.

MR. JUSTICE HARLAN delivered the opinion of the Court.

The present controversy, which involves the compatibility of the New York Social Services Law (c. 184, L. 1969) with § 402 (a)(23) of the Social Security Act of 1935, as amended, 81 Stat. 898, 42 U. S. C. § 602 (a)(23) (1964 ed., Supp. IV), arises out of a pendent claim originally included in petitioners' complaint bringing a class action challenging § 131–a of the same New York statute as violative of equal protection by virtue of its provision for lesser payments to Aid to Families With Dependent Children recipients in Nassau County than those allowed for New York City residents. Pursuant to the recommendation of Judge Weinstein, a

three-judge court was convened on April 24, 1969, and a hearing was held. 304 F. Supp. 1350.

Before a decision was rendered New York State amended § 131–a to permit the State Commissioner of Social Services to make, in his discretion, grants to recipients in Nassau County equal to those provided for New York City residents. The three-judge panel in a memorandum opinion of May 12, 1969, concluded that the equal protection issue was "no longer justiciable" and that "[t]he constitutional attack on the provision [§ 131–a] as originally adopted has been rendered moot and any attack on the newly adopted subdivision would not be ripe for adjudication . . . until there [had] been opportunity for action by state officials . . . ."[1] That court further held that since there existed "no reason for continuing the three-judge court," the "matter" should be "remanded to the single judge to whom the complaint was originally presented for such further proceedings as are appropriate." 304 F. Supp. 1354, 1356. On the same day as the three-judge court dissolved itself, Judge Weinstein issued a preliminary injunction prohibiting respondents from reducing or discontinuing payments of "regular recurring grants and special grants," payable under the predecessor welfare law, 304 F. Supp. 1356, and the State's elimination of which from the computation of welfare benefits is the subject matter of the controversy now before this Court.

An interlocutory appeal was taken to the Court of Appeals and the case was granted a calendar preference. After hearing oral argument the Court of Appeals, on June 11, entered an order staying the preliminary in-

---

[1] A separate action was subsequently brought again challenging the disparity in payments between New York and Nassau County welfare recipients. See *Rothstein* v. *Wyman*, 303 F. Supp. 339 (D. C. S. D. N. Y. 1969), prob. juris. noted, *post*, p. 903.

junction pending its disposition of the appeal and later converted its stay into an order staying the permanent injunction subsequently issued by the District Court when it granted summary judgment on June 18, 1969, 304 F. Supp. 1356, 1381. On July 16, 1969, the Court of Appeals panel announced its judgment of reversal, accompanied by three opinions. 414 F. 2d 170. Chief Judge Lumbard and Judge Hays agreed that the three-judge panel had properly dissolved itself and were of the view, for somewhat different reasons, that Judge Weinstein should not have ruled on the merits of petitioners' statutory claim; they also expressed their opinion that the single-judge District Court (hereinafter District Court) erred on the merits. Judge Feinberg disagreed on all scores, expressing the view that the District Court properly reached and correctly decided the merits of the statutory claim.

Petitioners' application to the author of this opinion, as Circuit Justice, for a stay and an accelerated review was referred by him to the entire Court, and on October 13, 1969, certiorari was granted. 396 U. S. 815. The request for a stay was denied but the case was set down for early argument.

We now reverse. For essentially those reasons stated in the opinion of the District Court and Circuit Judge Feinberg's dissent, we think the District Court correctly exercised its discretion by proceeding to the merits. We are also unable to accept the conclusion reached by a majority of the Court of Appeals that § 402 (a)(23) does not affect States like New York that place no limitation on the level of payments of welfare benefits as determined by their standard of need. For reasons set forth in Part II, we conclude that the present New York program does not fulfill the requirements of § 402 (a)(23) of the federal statute.

I

A

We consider the threshold question of whether subject matter jurisdiction was vested in the District Court to decide this federal statutory challenge to the New York Social Services Law.

That the three-judge court itself not only had jurisdiction but would have been obliged to adjudicate this statutory claim in preference to deciding the original constitutional claim in this case follows from *King* v. *Smith,* 392 U. S. 309 (1968), where, on an appeal from a three-judge court, we decided the statutory question in order to avoid a constitutional ruling. 392 U. S., at 312 n. 3. In the case before us the constitutional claim was declared moot prior to decision by the three-judge court and the question arises whether that circumstance removed not only the *obligation* but destroyed the *power* of a federal court to adjudicate the pendent claim.[2] We think not. Jurisdiction over federal claims, constitutional or otherwise, is vested, exclusively or concurrently, in the federal district courts. Such courts usually sit as single-judge tribunals. While Congress has determined that certain classes of cases shall be heard in the first instance by a district court composed of three judges, that does not mean that the court *qua* court loses all

---

[2] Judge Hays expressed the view:

"Since the single judge at no time had jurisdiction over the constitutional claim there was never a claim before him to which the statutory claim could have been pendent. If the three-judge court had attempted to give the single judge power to adjudicate the statutory claim, it could not have done so, since with the dissolution of the three-judge court the statutory claim was no longer pendent to any claim at all, much less to any claim over which the single judge could exercise adjudicatory power." 414 F. 2d, at 175.

jurisdiction over the complaint that is initially lodged with it. To the contrary, once petitioners filed their complaint alleging the unconstitutionality of § 131–a, the District Court sitting as a one-man tribunal, was properly seised of jurisdiction over the case under §§ 1343 (3) and (4) of Title 28 and could dispose of even the constitutional question either by dismissing the complaint for want of a substantial federal question, *Ex parte Poresky,* 290 U. S. 30 (1933),[3] or by granting requested injunctive relief if "prior decisions [made] frivolous any claim that [the] state statute on its face [was] not unconstitutional." *Bailey* v. *Patterson,* 369 U. S. 31, 33 (1962). Even had the constitutional claim not been declared moot, the most appropriate course may well have been to remand to the single district judge for findings and the determination of the statutory claim rather than encumber the district court, at a time when district court calendars are overburdened, by consuming the time of three federal judges in a matter that was not required to be determined by a three-judge court. See *Swift & Co.* v. *Wickham,* 382 U. S. 111 (1965).

On remand the District Court correctly considered mootness a factor affecting its discretion, not its power, and balanced the policy considerations that have spawned the doctrine of pendency and the countervailing policy of federalism: the extent of the investment of judicial energy and the character of the claim. Not only had there been hearings and argument prior to dismissal of

---

[3] Even if *Poresky* is read simply as a restatement of the truism that a court always has jurisdiction to determine its own jurisdiction, in view of the now settled rule that the insubstantiality of a federal question is the occasion for a jurisdictional dismissal as opposed to a dismissal on the merits for failure to state a claim upon which relief can be granted, it still lends support to the proposition that jurisdiction is vested at the outset in the *district court* and not the three-judge panel.

the constitutional claim, but the statutory question is so essentially one "of federal policy that the argument for exercise of pendent jurisdiction is particularly strong." [4] *United Mine Workers* v. *Gibbs,* 383 U. S. 715, 727 (1966).

Respondents analogize dismissal for mootness to dismissal for want of a substantial claim and rely on language in *United Mine Workers* v. *Gibbs,* to the effect that a federal court should not pass on a state claim when the federal claim falters at the threshold and is "dismissed before trial." [5] 383 U. S., at 726. The argument would appear to be that once a federal court loses power over the jurisdiction-conferring claim, it may not consider a pendent claim. They contend that mootness, like insubstantiality, is a threshold jurisdictional defect.

Whether or not the view that an insubstantial federal question does not confer jurisdiction—a maxim more ancient than analytically sound—should now be held to mean that a district court should be considered without *discretion,* as opposed to *power,* to hear a pendent claim, we think the respondents' analogy fails. Unlike insubstantiality, which is apparent at the outset, mootness, frequently a matter beyond the control of the parties, may not occur until after substantial time and energy have been expended looking toward the resolution of a dispute that plaintiffs were entitled to bring in a federal court.

---

[4] We intimate no view as to whether the situation might have been different had the constitutional claim become moot before the District Court had invested substantial time in its resolution.

[5] See *United Mine Workers* v. *Gibbs,* 383 U. S., at 725, where the Court said:

"[I]f, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole."

We are not willing to defeat the commonsense policy of pendent jurisdiction—the conservation of judicial energy and the avoidance of multiplicity of litigation— by a conceptual approach that would require jurisdiction over the primary claim at all stages as a prerequisite to resolution of the pendent claim.[6] The Court has shunned this view. See *Moore* v. *New York Cotton Exch.*, 270 U. S. 593 (1926); *Hurn* v. *Oursler*, 289 U. S. 238 (1933) (dictum).[7]

## B

A further reason given to support the contention that the District Court should have declined to exercise jurisdiction is that the Department of Health, Education, and Welfare was the appropriate forum, at least in the first instance, for resolution on the merits of the questions before us, and that at the time this action came to Court HEW was "engaged in a study of the relationship between Section 602 (a)(23) and Section

---

[6] A persuasive analogy is to be found in the well-settled rule that a federal court does not lose jurisdiction over a diversity action which was well founded at the outset even though one of the parties may later change domicile or the amount recovered falls short of $10,000. See *Smith* v. *Sperling*, 354 U. S. 91, 93 n. 1 (1957); *St. Paul Mercury Indemnity Co.* v. *Red Cab Co.*, 303 U. S. 283, 289–290 (1938); *Smithers* v. *Smith*, 204 U. S. 632 (1907); see generally C. Wright, Federal Courts § 33, pp. 93–94 (1963).

[7] Since we conclude that the District Court properly exercised its pendent jurisdiction, we have no occasion to consider whether, as urged by petitioners, this statutory claim satisfies the $10,000 amount-in-controversy requirement of the general federal jurisdiction provision, 28 U. S. C. § 1331, or whether it could be maintained under 28 U. S. C. § 1343 (3), which contains no amount-in-controversy limitation, as an action "[t]o redress the deprivation, under color of any State law . . . of any right, privilege or immunity secured by . . . any Act of Congress providing for equal rights of citizens . . . ." See *King* v. *Smith*, 392 U. S., at 312 n. 3; see generally Note, Federal Judicial Review of State Welfare Practices, 67 Col. L. Rev. 84 (1967).

131–a." 414 F. 2d, at 176 (opinion of Judge Hays).[8]
Petitioners answer, we think correctly, that neither the
principle of "exhaustion of administrative remedies" nor
the doctrine of "primary jurisdiction" has any application
to the situation before us. Petitioners do not seek re-
view of an administrative order, nor could they have
obtained an administrative ruling since HEW has no pro-
cedures whereby welfare recipients may trigger and par-
ticipate in the Department's review of state welfare
programs. Cf. *Abbott Laboratories* v. *Gardner*, 387
U. S. 136 (1967); K. Davis, Administrative Law § 19.01
(1965); L. Jaffe, Judicial Control of Administrative
Action 425 (1965).

That these formal doctrines of administrative law do
not preclude federal jurisdiction does not mean, how-
ever, that a federal court must deprive itself of the
benefit of the expertise of the federal agency that is
primarily concerned with these problems. Whenever

---

[8] In order to evaluate this argument, it is necessary to understand
the mechanism by which HEW reviews state plans under the
AFDC program. States desiring to obtain federal funds available
for AFDC programs are required to submit a plan to the Secretary
of HEW for his approval. 42 U. S. C. § 601 (1964 ed., Supp.
IV). Once initially approved, federal funds are provided to the
State until a change in its plan is formally disapproved. 42
U. S. C. § 604 (a) (1964 ed., Supp. IV). The Secretary must
afford the State notice of an alleged noncompliance with federal
requirements and an opportunity for a hearing. *Ibid.* If, after
notice and hearing, the Secretary finds that the State does not comply
with the federal requirements, he is directed to make a total or par-
tial cutoff of federal funds to the State. *Ibid.* 42 U. S. C. § 1316
(1964 ed., Supp. IV) describes the administrative procedures that the
Secretary must afford a State before cutting off funds, and also
provides for review in the courts of appeals of the Secretary's action
at the behest of the State. Whether HEW could provide a mech-
anism by which welfare recipients could theoretically get relief is
immaterial. It has not done so, which means there is no basis for
the refusal of federal courts to adjudicate the merits of these claims.

possible the district courts should obtain the views of HEW in those cases where it has not set forth its views, either in a regulation or published opinion, or in cases where there is real doubt as to how the Department's standards apply to the particular state regulation or program.[9]

The District Court, in this instance, made considerable effort to learn the views of HEW. The possibility of HEW's participation, either as a party or an *amicus*, was explored in the District Court and the Department at that stage determined to remain aloof. We cannot in these circumstances fault the District Court for proceeding to try the case.

## II

We turn to the merits which may be broadly characterized as involving the interpretation of § 402 (a)(23) of the Social Security Amendments of 1967 and its application to certain changes inaugurated by New York in its method of computing welfare benefits that have resulted in reduced payments to these petitioners and, on a broader scale, decreased by some $40 million the State's public assistance undertaking.

## A

We begin with a brief review of the general structure of the Federal Aid to Families With Dependent Children (AFDC) program, one of the four "categorical assistance"

---

[9] As we observed in *Southwestern Sugar & Molasses Co., Inc.* v. *River Terminals Corp.*, 360 U. S. 411, 420 (1959), that an issue is "one appropriate ultimately for judicial rather than administrative resolution . . . does not mean that the courts must therefore deny themselves the enlightenment which may be had from a consideration of the relevant . . . facts which the administrative agency charged with regulation of the transaction . . . is peculiarly well equipped to marshal and initially to evaluate." See also *Far East Conference* v. *United States*, 342 U. S. 570, 574–575 (1952).

programs established by the Social Security Act of 1935.[10]

The general topography of the AFDC program was mapped in part by this Court in *King* v. *Smith*, 392 U. S. 309 (1968); and several lower court opinions, in addition to the opinion below, have surveyed the pertinent statutory and regulatory provisions.[11] While participating States must comply with the terms of the federal legislation, see *King* v. *Smith, supra,* the program is basically voluntary and States have traditionally been at liberty to pay as little or as much as they choose, and there are, in fact, striking differences in the degree of aid provided among the States.

There are two basic factors that enter into the determination of what AFDC benefits will be paid. First, it is necessary to establish a "standard of need," a yardstick for measuring who is eligible for public assistance. Second, it must be decided how much assistance will be given, that is, what "level of benefits" will be paid. On both scores Congress has always left to the States a great deal of discretion. *King* v. *Smith*, 392 U. S., at 318. Thus, some States include in their "standard of need" items that others do not take into account. Diversity also exists with respect to the level of benefits in fact paid.[12] Some States impose so-called dollar maximums

---

[10] The four categorical assistance programs are the Old Age Assistance (OAA), 42 U. S. C. § 301 *et seq.;* Aid to Families With Dependent Children (AFDC), 42 U. S. C. § 601 *et seq.;* Aid to the Blind (AB), 42 U. S. C. § 1201 *et seq.;* Aid For the Permanently and Totally Disabled (APTD), 42 U. S. C. § 1351 *et seq.*

[11] See *Lampton* v. *Bonin,* 299 F. Supp. 336, 304 F. Supp. 1384 (D. C. E. D. La. 1969); *Jefferson* v. *Hackney,* 304 F. Supp. 1332 (D. C. N. D. Tex. 1969); *Williams* v. *Dandridge,* 297 F. Supp. 450 (1968 and 1969), prob. juris. noted, 396 U. S. 811 (1969), decided this date, *post,* p. 471.

[12] According to information supplied by HEW in 1967, reported in the Explanation of Provisions of H. R. 5710, p. 36, $3,100 annually for a family of four marked the "poverty"

on the amount of public assistance payable to any one individual or family. Such maximums establish the upper limit irrespective of how far short the limitation may fall of the theoretical standard of need. Other States curtail the payments of benefits by a system of "ratable reductions" whereby all recipients will receive a fixed percentage of the standard of need.[13] It is, of course, possible to pay 100% of need as defined. New York, in fact, purports to do so.

## B

In 1967 the Administration introduced omnibus legislation to amend the social security laws. The relevant AFDC proposals provided for more adequate assistance to welfare recipients and set up several programs for education and training accompanied by child care provisions designed to permit AFDC parents to take advantage of the training programs. In the former respect the AFDC proposals paralleled other provisions that put forward amendments to adjust benefits to recipients of other

---

level. According to the report, "Although a few States define need at or above the poverty level, no State pays as much as that amount." It further appears that at that time 33 States provided less than their avowed standard of need which frequently fell short of the poverty mark. While New York purports to have paid its full standard, it would thus appear not to have paid enough to take a family out of poverty. See Hearings before the House Committee on Ways and Means on H. R. 5710, 90th Cong., 1st Sess., pt. 1, p. 118 (1967).

[13] A maximum may either be fixed in relation to the number of persons on welfare, e. g., X dollars per child, no matter what age, or in terms of a family, X dollars per family unit, irrespective of the number of persons in the unit. This latter procedure has been challenged on equal protection grounds, see Williams v. Dandridge, supra. A "ratable reduction" represents a fixed percentage of the standard of need that will be paid to all recipients. In the event that there is some income that is first deducted, the ratable reduction is applied to the amount by which the individual or family income falls short of need.

categorical aid to reflect the rise in the cost of living.[14] Thus, in its embryo stage the amendment to § 402 was § 202 (b) of the Administration bill, H. R. 5710, 90th Cong., 1st Sess. (1967), which would have added to § 402 (a) of the Social Security Act the following clause:

> "(14) provide (A), effective July 1, 1969, for meeting (in conjunction with other income that is not disregarded . . . under the plan and other resources) *all the need*, as determined in accordance with standards applicable under the plan for determining need, of individuals eligible to receive aid to families with dependent children (and such standards shall *be no lower than the standards for determining need in effect* on January 1, 1967), and (B), effective July 1, 1968, for an annual review of such standards and (to the extent prescribed by the Secretary) for up-dating such standards to take into account changes in living costs." (Emphasis added.)

Section 202 (b), however, was stillborn and no such provision was contained in the ultimate bill reported out by the House Ways and Means Committee. See H. R. 12080, 90th Cong., 1st Sess.

The Administration's renewed efforts, on behalf of a mandatory increase in benefit payments under the categorical assistance programs,[15] met with only limited suc-

---

[14] See §§ 202 (a), (c), (d), and (e).

[15] Secretary Gardner testified:

"The House bill does nothing to improve the level of State public assistance payments. As things stand today, the States are required to set assistance standards for needy persons in order to determine eligibility—but they need not make their assistance payments on the basis of these standards. The result is that welfare payments are much too low in a good many States. That is a widely accepted fact among all who are concerned with these programs; indeed it

cess, resulting in § 213 (a) of the Senate version, which provided for a mandatory $7.50 per month increase in the standards and benefits for the adult categories, and § 213 (b) which is, in substance, the present § 402 (a)(23). The Committee's comment on § 213 (b), to the effect that States would be required "to price their standards . . . to reflect changes in living costs," tracks the statutory language.[16]

---

is probably the most widely agreed-upon fact among welfare experts today.

"We strongly urge you to adopt the administration's proposal requiring States to meet need in full as they determine it in their own State assistance standards, and to update these standards periodically to keep pace with changes in the cost of living." Hearings before the Senate Committee on Finance on H. R. 12080, 90th Cong., 1st Sess., pt. 1, p. 216 (1967). See also testimony of Undersecretary Cohen. *Id.*, at 255–259.

[16] The comment to § 213 in the Senate Report reads:

"Social security benefits have been increased 15 percent across the board by the committee with a minimum of $70, for an average increase of 20 percent. However, there is no similar across-the-board increase in the amount of benefits payable to aged welfare recipients. . . . In view of this situation and the need to recognize that the increase in the cost of living since the last change made in the Federal matching formula in 1965 also is detrimental to the well-being of these recipients, the committee is recommending a further change in the law. It is proposed that the law be amended to provide that recipients of old-age assistance, aid to the blind, and aid to the permanently and totally disabled shall receive an average increase in assistance plus social security or assistance alone (for the recipients who do not receive social security benefits) of $7.50 a month. . . .

. . . . .

"To accomplish these changes, the States would have to adjust their standards and any maximums imposed on payments by July 1, 1968, so as to produce an average increase of $7.50 from assistance alone or assistance and social security benefits (or other income). Any State which wishes to do so can claim credit for any increase

The Conference Committee eliminated the Senate provision in § 213 which would have required an annual adjustment for cost of living, and § 402 (a) (23) was enacted. It now provides:

> "[The States shall] provide that by July 1, 1969, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted."

## C

The background of § 402 (a) (23) reveals little except that we have before us a child born of the silent union of legislative compromise. Thus, Congress, as it frequently does, has voiced its wishes in muted strains and left it to the courts to discern the theme in the cacophony of political understanding. Our chief resources in this undertaking are the words of the statute and those common-sense assumptions that must be made in determining direction without a compass.

Reverting to the language of § 402 (a) (23) we find two separate mandates: first, the States must re-evaluate the component factors that compose their need equation; and, second, any "maximums" must be adjusted.

We think two broad purposes may be ascribed to § 402 (a) (23): First, to require States to face up realistically to

---

it may have made since December 31, 1966. Thus, no State needs to make an increase to the extent that it has recently done so.

"States would be required to price their standards used for determining the amount of assistance under the AFDC program by July 1, 1969 and to reprice them at least annually thereafter, adjusting the standards and any maximums imposed on payments to reflect changes in living costs." S. Rep. No. 744, 90th Cong., 1st Sess., 169–170 (1967); see also id., at 293.

the magnitude of the public assistance requirement and lay bare the extent to which their programs fall short of fulfilling actual need; second, to prod the States to apportion their payments on a more equitable basis. Consistent with this interpretation of § 402 (a)(23), a State may, after recomputing its standard of need, pare down payments to accommodate budgetary realities by reducing the percent of benefits paid or switching to a percent reduction system, but it may not obscure the *actual* standard of need.

The congressional purpose we discern does not render § 402 (a)(23) a meaningless exercise in "bookkeeping." Congress sometimes legislates by innuendo, making declarations of policy and indicating a preference while requiring measures that, though falling short of legislating its goals, serve as a nudge in the preferred directions. In § 402 (a)(23) Congress has spoken in favor of increases in AFDC payments. While Congress rejected the mandatory adjustment provision in the administration bill, it embodied in legislation the cost-of-living exercise which has both practical and political consequences.

It has the effect of requiring the States to recognize and accept the responsibility for those additional individuals whose income falls short of the standard of need as computed in light of economic realities and to place them among those eligible for the care and training provisions. Secondly, while it leaves the States free to effect downward adjustments in the level of benefits paid, it accomplishes within that framework the goal, however modest, of forcing a State to accept the political consequence of such a cutback and bringing to light the true extent to which actual assistance falls short of the minimum acceptable. Lastly, by imposing on those States that desire to maintain "maximums" the requirement of an appropriate adjustment, Congress has introduced an incentive to abandon a flat "maximum" system,

thereby encouraging those States desirous of containing their welfare budget to shift to a percentage system that will more equitably apportion those funds in fact allocated for welfare and also more accurately reflect the real measure of public assistance being given.

While we do not agree with the broad interpretation given § 402 (a)(23) by the District Court,[17] we cannot accept the conclusion reached by the two-judge majority in the Court of Appeals—that § 402 (a)(23) does not affect New York.[18] It follows from what we fathom to

---

[17] The District Court, while disclaiming any construction of § 402 (a)(23) that would preclude converting to a flat-grant system by averaging, concluded: "[S]ection 402 (a)(23) precludes a state from making changes resulting in either reduced standards of need or *levels* of *payments.*" 304 F. Supp., at 1377. (Emphasis added.) An extensive alteration in the basic underlying structure of an established program is not to be inferred from ambiguous language that is not clarified by legislative history. Such legislative history as there is suggests the opposite. The Senate's failure to adopt the Administration's proposals and its failure to provide for AFDC recipients an increase like that provided for the adult program, notwithstanding a proposed amendment to that effect by Senator McGovern, gives rise to an inference, not negatived by the noncommittal and unilluminating comments of the committee, see n. 16, *supra,* that Congress had no such purpose. These considerations, we think, foreclose the broad construction adopted by the District Court.

[18] While it might be technically said that there was no majority holding on the merits in the Court of Appeals, this overlooks Judge Hays' preface to his discussion of the merits: "Although we are persuaded that the district judge had no power to adjudicate this action, we turn to a brief discussion of the merits, since our decision does not rest solely on jurisdictional grounds." 414 F. 2d, at 178. Chief Judge Lumbard disavowed reaching the merits but expressly disagreed with Judge Feinberg. 414 F. 2d, at 181. In these circumstances, it would be hypertechnical to conclude that the merits had not been faced and decided below so as to make a remand desirable prior to review and decision by this Court. Cf. *Barlow* v. *Collins, ante,* p. 159.

be the congressional purpose that a State may not redefine its standard of need in such a way that it skirts the requirement of re-evaluating its existing standard. This would render the cost-of-living reappraisal a futile, hollow, and, indeed, a deceptive gesture, and would avoid the consequences of increasing the numbers of those eligible and facing up to the failure to allocate sufficient funds to provide for them.

These conclusions, if not compelled by the words of the statute or manifested by legislative history, represent the natural blend of the basic axiom—that courts should construe all legislative enactments to give them some meaning—with the compromise origins of § 402 (a) (23), set forth above. This background, we think, precludes the more adventuresome reading that petitioners and the District Court would give the statute. See n. 17, *supra.* This reading is also buttressed by the fact that this construction has been placed on the statute by the Department of Health, Education, and Welfare.[19] While, in view of Congress' failure to track the Administration proposals and its substitution without comment of the present compromise section, HEW's construction commands less than the usual deference that may be accorded an administrative interpretation based on its expertise, it is entitled to weight as the attempt of an experienced agency to harmonize an obscure enactment with the basic structure of a program it administers. Cf. *Zuber* v. *Allen,* 396 U. S. 168, 192 (1969); *Udall* v. *Tallman,* 380 U. S. 1 (1965).

D

While the application of the statute to the New York program is by no means simple, we think the evidence adduced supports the ultimate finding of the District

---

[19] The regulations and explanations are set forth in the Government's Amicus Memorandum.

Court, unquestioned by the Court of Appeals, that New York has, in effect, impermissibly lowered its standard of need by eliminating items that were included prior to the enactment of § 402 (a)(23).

Prior to March 31, 1969, New York computed its standard of need on an individualized basis. Schedules existed showing the cost of particular items of recurring need, for example, food and clothing required by children at given ages. Payments of "recurring" grants were made to families based on the number of children per household and the age of the oldest child. Additional payments, designated as "special needs grants," were also made. Under an experiment in New York City instituted August 27, 1968, many allowances for special needs were eliminated and a flat grant of $100 per person was substituted.

Chapter 184 of the Session Laws, the present § 131–a, radically altered the New York approach. In lieu of individualized grants for "recurring" needs to be supplemented by special grants or the flat $100 grant, New York adopted a system fixing maximum allowances per family based on the number of individuals per household. The maximum dollar amounts were established by ascertaining "[t]he mean age of the oldest child in each size family." See Memorandum of Law in Support of Defendants' Motion for Summary Judgment 9–10. While these family maximums are exclusive of rent and fuel costs, the District Court found that "[s]pecial grants were seemingly not included in these computations. No attempt was made to average them out across the state and then to add that figure to that of the basic recurring grant." 304 F. Supp., at 1368.

The impact of the new system has been to reduce substantially benefits paid to families of these petitioners and of those similarly situated, and to decrease benefits to New York City recipients by almost $40,000,000. 304

F. Supp., at 1369–1370. The effect of the new program on upstate cases is less severe, with gains to some families apparently cancelling out losses to others, but the net effect is a drastic reduction in overall payments since New York City recipients compose approximately 72% of the State's welfare clientele. 304 F. Supp., at 1369.

E

Notwithstanding this $40,000,000 decrease in welfare payments after adjustment for increases in the cost of living, the State argues that the present § 131–a represents neither an attempt to circumvent federal requirements nor a reduction in the content of its former standard. The conversion to a flat grant maximum system is justified as an advance in administrative efficiency.[20]

While § 402 (a)(23) does not prevent the States from pursuing what is beyond dispute the laudable goal of administrative efficiency,[21] we think Congress has foreclosed them from achieving this purpose at the expense of significantly reducing the content of their standard of need. The findings and conclusions of the District

---

[20] New York points to the preamble to § 131–a which sets forth as its purpose the streamlining of administration of the welfare grant system and relies on that part of the HEW program that invites the States to adopt administrative programs that curtail unnecessarily burdensome calculations and paperwork.

[21] HEW's position, set forth in the Government's Amicus Memorandum 12, seems to be that under its regulations, a "reduction of content" does not necessarily result from "reductions in the recognition of special needs." The Department has, however, recognized both administratively and in the Government's Memorandum that certain "special" needs should properly be regarded as part of the basic standard. Thus, while the memorandum suggests that payments for special diets or special attendants are extraordinary and not susceptible of averaging, it leaves open the question whether New York's special grants have not been for recurring items which are basic.

Court, undisturbed by the Court of Appeals and supported by the record, clearly demonstrate that a significant reduction has here occurred. It is conceded by respondents that the present program does not include allowances for the items formerly covered by the so-called "special" grants.

We have no occasion to decide on the record before us whether we agree with that part of HEW's interpretation of § 402 (a)(23) that might approve elimination of grants for particular needs, without some averaging or other provision therefor such as direct payments to the provider of services. It suffices in this case that particular items, such as laundry and telephones, had formerly been deemed essential by New York, and were considered regular recurring expenses to a significant number of New York City welfare residents. We need look no farther than the state social service department's own regulations and the action taken by the state administrators in providing the $25 per quarter cyclical grant to city residents in the 1968 pilot project.

Thus, the state social service department's own regulations provided:

> "An individual or family shall be deemed 'in need' when a budget deficit exists or when the budget surplus is inadequate to meet one or more non-budgeted *special needs* required by the case circumstances and included in the *standards of assistance.*" 18 NYCRR § 353.1 (c).[22]   (Emphasis added.)

This persuasive, if not conclusive, evidence of what constituted the standard of need is further supported by

---

[22] See also former 18 NYCRR § 351.2, Aspects of Eligibility. "Social investigation shall cover the following aspects of initial and continuing eligibility. (b) *Need.* Consideration shall be given to individual and family requirements for the items of basic maintenance and for items of *special need. . . .*" (Second emphasis added.)

testimony of the administrators of New York's welfare program to the effect that these grants covered costs for essentials of life for numerous welfare residents in New York City.

## F

We reach our conclusions without relying on the finding made by the court below that in § 131–a New York was *attempting* to constrict its welfare payments. Speculation as to legislative and executive motive is to be shunned. Section 402 (a)(23) invalidates any state program that substantially alters the content of the standard of need in such a way that it is less than it was prior to the enactment of § 402 (a)(23), unless a State can demonstrate that the items formerly included no longer constituted part of the reality of existence for the majority of welfare recipients. We do not, of course, hold that New York may not, consistently with the federal statutes, consolidate items on the basis of statistical averages. Obviously such averaging may affect some families adversely and benefit others. Moreover, it is conceivable that the net payout, assuming no change in the level of benefits, may be somewhat less under a streamlined program. Providing all factors in the old equation are accounted for and fairly priced and providing the consolidation on a statistical basis reflects a fair averaging, a State may, of course, consistently with § 402 (a)(23) redefine its method for determining need. A State may, moreover, as we have noted, accommodate any increases in its standard by reason of "cost-of-living" factors to its budget by reducing its level of benefits. What is at the heart of this dispute is the elimination of special grants in the New York program, not the system of maximum grants based on average age. Lest there be uncertainty we also reiterate that New York is

not foreclosed from accounting for basic and recurring items of need formerly subsumed in the special grant category by an averaging system like that adopted in the 1968 New York City experiment with cyclical grants.

## III

New York is, of course, in no way prohibited from using only *state* funds according to whatever plan it chooses, providing it violates no provision of the Constitution. It follows, however, from our conclusion that New York's program is incompatible with § 402 (a)(23), that petitioners are entitled to declaratory relief and an appropriate injunction by the District Court against the payment of *federal* monies according to the new schedules, should the State not develop a conforming plan within a reasonable period of time.

We have considered and rejected the argument that a federal court is without power to review state welfare provisions or prohibit the use of federal funds by the States in view of the fact that Congress has lodged in the Department of HEW the power to cut off federal funds for noncompliance with statutory requirements. We are most reluctant to assume Congress has closed the avenue of effective judicial review to those individuals most directly affected by the administration of its program. Cf. *Abbott Laboratories* v. *Gardner,* 387 U. S. 136 (1967); *Association of Data Processing Service Organizations* v. *Camp, ante,* p. 150; *Barlow* v. *Collins, ante,* p. 159. We adhere to *King* v. *Smith,* 392 U. S. 309 (1968), which implicitly rejected the argument that the statutory provisions for HEW review of plans should be read to curtail judicial relief and held Alabama's "substitute father" regulation to be inconsistent with the federal statute. While *King* did not advert specifically to the remedial problem, the unarticulated premise was that the State had alternative choices of

assuming the additional cost of paying benefits to families with substitute fathers or not using federal funds to pay welfare benefits according to a plan that was inconsistent with federal requirements.

The prayer in the District Court in *Smith* v. *King,* as in the case before us, was for declaratory and injunctive relief against the enforcement of the invalid provision. 277 F. Supp. 31 (D. C. M. D. Ala. 1967). We see no justification in principle for drawing a distinction between invalidating a single nonconforming provision or an entire program. In both circumstances federal funds are being allocated and paid in a manner contrary to that intended by Congress. In *King* the withholding of benefits based on the invalid state regulation resulted in overpayments to some recipients, assuming a constant state welfare budget, and a corresponding misallocation of matching federal resources. In the case before us, noncompliance with § 402 (a)(23) may result in limiting the welfare rolls unduly and thus channeling the matching federal grants in a way not intended by Congress. We may also assume that Congress would not countenance the circumnavigation of the political consequences of § 402 (a)(23), see Part II C, *supra,* by permitting States to use federal funds while obscuring the actual extent to which their programs fall short of the ideal.

Unlike *King* v. *Smith,* however, any incremental cost to the State, assuming a desire to comply with § 402 (a)(23), is massive; nor is there a discrete and severable provision whose enforcement can be prohibited. Accordingly, we remand the case to the District Court to fix a date that will afford New York an opportunity to revise its program in accordance with the requirements of § 402 (a)(23) if the State wishes to do so. The District Court shall retain jurisdiction to review, taking into account the views of HEW should it care to offer its recommenda-

tions, any revised program adopted by the State, or, should New York choose not to submit a revamped program by the determined date, issue its order restraining the further use of federal monies pursuant to the present statute.

In conclusion, we add simply this. While we view with concern the escalating involvement of federal courts in this highly complicated area of welfare benefits,[23] one that should be formally placed under the supervision of HEW, at least in the first instance, we find not the slightest indication that Congress meant to deprive federal courts of their traditional jurisdiction to hear and decide federal questions in this field. It is, of course, no part of the business of this Court to evaluate, apart from federal constitutional or statutory challenge, the merits or wisdom of any welfare programs, whether state or federal, in the large or in the particular. It is, on the other hand, peculiarly part of the duty of this tribunal, no less in the welfare field than in other areas of the law, to resolve disputes as to whether federal funds allocated to

---

[23] The judiciary is being called upon with increasing frequency to review not only the viability of state welfare procedures, e. g., Goldberg v. Kelly, ante, p. 254, and Wheeler v. Montgomery, ante, p. 280; Wyman v. James, 303 F. Supp. 935 (D. C. S. D. N. Y. 1969), prob. juris. noted, post, p. 904 (inspections of the house), but also the substance and structure of state programs and the validity of innumerable individual provisions. See, e. g., Shapiro v. Thompson, 394 U. S. 618 (1969) (residence requirements); King v. Smith, supra (substitute father); Solman v. Shapiro, 300 F. Supp. 409, aff'd, 396 U. S. 5 (1969); Lewis v. Stark, 312 F. Supp. 197 (D. C. N. D. Cal. 1968), prob. juris. noted, 396 U. S. 900 (1969) ("man-in-the-house rule"). At least two other actions have been instituted to review various aspects of state programs in light of the statutory provisions involved in this case. See Lampton v. Bonin, 299 F. Supp. 336, 304 F. Supp. 1384 (D. C. E. D. La. 1969); Jefferson v. Hackney, 304 F. Supp. 1332 (D. C. N. D. Tex. 1969); cf. Rothstein v. Wyman, 303 F. Supp. 339 (D. C. S. D. N. Y. 1969); Dandridge v. Williams, decided today, post, p. 471.

the States are being expended in consonance with the conditions that Congress has attached to their use. As Mr. Justice Cardozo stated, speaking for the Court in *Helvering* v. *Davis,* 301 U. S. 619, 645 (1937): "When [federal] money is spent to promote the general welfare, the concept of welfare or the opposite is shaped by Congress, not the states." Cf. *Lassen* v. *Arizona ex rel. Arizona Highway Dept.,* 385 U. S. 458 (1967).

The judgment of the Court of Appeals is reversed and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS, concurring.

While I join this opinion of the Court, I add a few words.

I

Our leading case on pendent jurisdiction is *United Mine Workers* v. *Gibbs,* 383 U. S. 715, 721–729. In line with *Gibbs,* the courts below distinguished between the power to exercise pendent jurisdiction and the discretionary use of that power. *Gibbs* abandoned the "single cause of action" test which had been the controlling standard under *Hurn* v. *Oursler,* 289 U. S. 238, and instead held that pendent jurisdiction exists when "[t]he state and federal claims . . . derive from a common nucleus of operative fact" and "if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding." 383 U. S., at 725.

The claims presented in this case attacked the New York statute on two grounds. The constitutional ground attacked the differential in the level of welfare payments between New York City and Nassau County.

The statutory claim attacked the State's reduction in the overall level of payments, on the ground that it violated § 402 (a)(23) of the Social Security Act, as amended, 81 Stat. 898, 42 U. S. C. § 602 (a)(23) (1964 ed., Supp. IV), which requires States to make cost-of-living adjustments in the amounts used to determine need. No argument is made by any of the parties in this case that the *three-judge* court did not have pendent jurisdiction over the statutory claim. The sole basis for respondents' contention that pendent jurisdiction is not present in this case flows from the action of the three-judge court in remanding the case to the single district judge "for such further proceedings as are appropriate."

Yet if the three-judge court had pendent jurisdiction over the statutory claim, it had the power to decide that claim despite the dismissal of the constitutional claim. This Court held in *United States* v. *Georgia Pub. Serv. Comm'n,* 371 U. S. 285, 287–288: "Once [a three-judge court is] convened the case can be disposed of below or here on any ground, whether or not it would have justified the calling of a three-judge court." See also *Florida Lime & Avocado Growers, Inc.* v. *Jacobsen,* 362 U. S. 73, 80–81. There is no rule, however, holding that a three-judge court is *required* to decide all the claims presented in a suit properly before it, although the practice of a three-judge court remanding a case to the initial district judge for further proceedings seems to have been little used. See *Landry* v. *Daley,* 288 F. Supp. 194.

What united Judges Hays and Lumbard was the view that, as a matter of discretion, the District Court should have refused to exercise its pendent jurisdiction. The factors outlined in *Gibbs* to guide the discretionary exercise of pendent jurisdiction are those of "judicial economy, convenience and fairness to litigants." 383 U. S., at 726.

The main distinction between this case and *Gibbs* is that the pendent claim here was one of federal rather than state law. And it is clear from the opinion in *Gibbs* that the factor of federal-state comity is highly relevant in deciding whether or not the exercise of pendent jurisdiction is proper. Thus the Court stated: "There may, on the other hand, be situations in which the state claim is so closely tied to questions of federal policy that the argument for exercise of pendent jurisdiction is particularly strong." *Id.*, at 727. Since the claim involved here is one of federal law, the reasons for the exercise of pendent jurisdiction are especially weighty, and exceptional circumstances should be required to prevent the exercise.

Moreover, incident to the issuance of a temporary restraining order, prior to the impaneling of the three-judge court, District Judge Weinstein had received and considered substantial testimony, affidavits, and briefs, so that he required no further hearings or testimony prior to issuing his preliminary injunction opinion three days after the case was remanded to him. In light of this fact, considerations of economy, convenience, and fairness all point to the exercise of pendent jurisdiction. See *Moore* v. *New York Cotton Exch.*, 270 U. S. 593, 608–610.

II

The fact that the Department of Health, Education, and Welfare is studying the relationship between the contested provision of the New York statute and the relevant section of the Social Security Act is irrelevant to the judicial problem. Once a State's AFDC plan is initially approved by the Secretary of HEW, federal funds are provided the State until the Secretary finds, after notice and opportunity for hearing to the State, that changes in the plan or the administration of the plan are

in conflict with the federal requirements. Social Security Act § 404 (a), 49 Stat. 628, as amended, 81 Stat. 918, 42 U. S. C. § 604 (a) (1964 ed., Supp. IV).

The statutory provisions for review by HEW of state AFDC plans[1] do not permit private individuals, namely, present or potential welfare recipients, to initiate or participate in these compliance hearings. Thus, there is no sense in which these individuals can be held to have failed to exhaust their administrative remedies by the fact that there has been no HEW determination on the compliance of a state statute with the federal requirements. In the present case, that problem was discussed in terms of the District Court's discretion to refuse to exercise pendent jurisdiction. The argument for such a refusal has little to commend it. HEW has been extremely reluctant to apply the drastic sanction of cutting off federal funds to States that are not complying with federal law. Instead, HEW usually settles its differences with the offending States through informal negotiations. See Note, Federal Judicial Review of State Welfare Practices, 67 Col. L. Rev. 84, 91–92 (1967).[2]

Whether HEW could provide a mechanism by which welfare recipients could theoretically get relief is immaterial. It has not done so, which means there is no basis for the refusal of federal courts to adjudicate the merits of these claims. Their refusal to act merely forces plaintiffs into the state courts which certainly are no more competent to decide the federal question than are the federal courts. The terms of the New York statute are clear, and there is no way in which a state court could interpret the challenged law in a way that would avoid the statutory claim pressed here.

---

[1] The procedure by which HEW reviews state plans is set out in the opinion of the Court, *ante,* at 406 n. 8.

[2] See Appendix to this concurrence.

State participation in federal welfare programs is not required.  States may choose not to apply for federal assistance or may join in some, but not all, of the various programs, of which AFDC is only one.  That a State may choose to refuse to comply with the federal requirements at the cost of losing federal funds is, of course, a risk that any welfare plaintiff takes.  Such a risk was involved in *King* v. *Smith,* 392 U. S. 309, which attacked Alabama's "substitute father" regulation as inconsistent with the Social Security Act.  As long as a State is receiving federal funds, however, it is under a legal requirement to comply with the federal conditions placed on the receipt of those funds; and individuals who are adversely affected by the failure of the State to comply with the federal requirements in distributing those federal funds are entitled to a judicial determination of such a claim.  *King* v. *Smith, supra.* The duty of a State, which receives this federal bounty to comply with the conditions imposed by Congress was adverted to by Mr. Justice Cardozo who wrote for the Court in *Steward Machine Co.* v. *Davis,* 301 U. S. 548, 597–598, sustaining the constitutionality of the Social Security Act:

> "Alabama is seeking and obtaining a credit of many millions in favor of her citizens out of the Treasury of the nation.  Nowhere in our scheme of government—in the limitations express or implied of our federal constitution—do we find that she is prohibited from assenting to conditions that will assure a fair and just requital for benefits received."

As he also said, speaking for the Court in *Helvering* v. *Davis,* 301 U. S. 619, 645, a companion case to *Steward Machine Co.:*

> "When money is spent to promote the general welfare, the concept of welfare or the opposite is shaped by Congress, not the states."

Where the suit involves an alleged conflict between the state regulation and the federal law, neither the United States nor HEW is a necessary party to such an action. The wrong alleged is the State's failure to comply with federal requirements in its use of federal funds, not HEW's failure to withhold funds from the State.

Whether HEW should withhold federal funds is entrusted to it, at least as a preliminary matter, by § 404 (a) of the Social Security Act.[3] Whether the courts have any role to perform beyond ruling on an alleged conflict between the state regulation and the federal law is a question we need not reach.

---

[3] Section 404 (a) of the Act provides: "In the case of any State plan for aid and services to needy families with children which has been approved by the Secretary, if the Secretary, after reasonable notice and opportunity for hearing to the State agency administering or supervising the administration of such plan, finds—

"(1) that the plan has been so changed as to impose any residence requirement prohibited by section 602 (b) of this title, or that in the administration of the plan any such prohibited requirement is imposed, with the knowledge of such State agency, in a substantial number of cases; or

"(2) that in the administration of the plan there is a failure to comply substantially with any provision required by section 602 (a) of this title to be included in the plan;

"[T]he Secretary shall notify such State agency that further payments will not be made to the State (or in his discretion, that payments will be limited to categories under or parts of the State plan not affected by such failure) until the Secretary is satisfied that such prohibited requirement is no longer so imposed, and that there is no longer any such failure to comply. Until he is so satisfied he shall make no further payments to such State (or shall limit payments to categories under or parts of the State plan not affected by such failure)." 42 U. S. C. § 604 (a) (1964 ed., Supp. IV).

APPENDIX TO OPINION OF DOUGLAS, J.,
CONCURRING

DEPARTMENT OF HEALTH, EDUCATION,
AND WELFARE

OFFICE OF THE SECRETARY
WASHINGTON, D. C. 20201

December 29, 1969

Mr. George R. Houston
Associate Librarian
The Supreme Court of the United States
1st Street & East Capitol, N. W.
Washington, D. C. 20543

Dear Mr. Houston:

This relates to your conversation with me on December 29 concerning statements made in the last paragraph and footnote 55 on page 91 of volume 67, Columbia Law Review, January 1967, that this Department had not responded to a complaint and petition for hearing filed by Georgia and Arkansas claimants.

The author of the Law Review article is correct. There was, in fact, no response to the request for a conformity hearing. Had we replied to the letter, however, we would have stated, as we usually do in such cases, that conformity hearings are held only on the initiative of this Department when a determination has been made that the deficiencies in a state program are such that the state, under its applicable laws, cannot, or the responsible official, will not, voluntarily bring the state into compliance.

Letters such as the one you refer to may, however, trigger action by this Department when the contents

bring to light conformity matters of which the Department has not been made aware . . . as a result of its own audits.

To date this Department has initiated conformity hearings in connection with the state plans of Nevada and Connecticut. In view of the fact that the imposition of sanctions against states which are found to be out of conformity are mandatory, we exert every effort at our command to bring a state into conformity without the necessity of a formal hearing.

If you have any further questions, please let us know.

Very truly yours,

Robert C. Mardian,

General Counsel.

MR. JUSTICE BLACK, with whom THE CHIEF JUSTICE joins, dissenting.

Petitioners are New York welfare recipients who contend that recently enacted New York welfare legislation which reduces the welfare benefits to which they are entitled under the Aid to Families With Dependent Children (AFDC) program is inconsistent with the federal AFDC requirements found in § 402 (a)(23) of the Social Security Act, 42 U. S. C. § 602 (a)(23) (1964 ed., Supp. IV). The New York statute that petitioners are challenging, § 131–a of the New York Social Services Law, was enacted on March 31, 1969. Little more than a week later on April 9, petitioners filed their complaint challenging this statute. The Court today holds that "the District Court correctly exercised its discretion by proceeding to the merits" of petitioners' claim that the federal and state statutes are inconsistent. *Ante,* at 401. The Court reaches this conclusion despite the fact that the determination whether a State is following the federal AFDC requirements is clearly vested in the first

instance not in the federal courts but in the Department of Health, Education, and Welfare (HEW); despite the fact that at the very moment the District Court was deciding the merits of petitioners' claim HEW was performing its statutory duty of reviewing the New York legislation to determine if it was at odds with § 402 (a)(23); and despite the fact that if HEW had been given enough time to make a decision with regard to the New York legislation, its decision might have obviated the need for this and perhaps many other lawsuits. I regret that I cannot join an opinion which fails to give due consideration to the unmistakable intent of the Social Security Act to give HEW primary jurisdiction over these highly technical and difficult welfare questions, which affirms what is to me a clear abuse of discretion by the District Court, and which plunges this Court and other federal courts into an ever-increasing and unnecessary involvement in the administration of the Nation's categorical assistance programs administered by the States.[1]

Under the AFDC program, 42 U. S. C. §§ 601–610 (1964 ed. and Supp. IV), the Federal Government provides funds to a State on the condition that the State's plan for supplementing and distributing those funds to needy individuals satisfies the various federal requirements set out in the Social Security Act. By statute, the Secretary of HEW is charged with the duty of reviewing state plans to determine if they comply with the now considerable list of federal requirements, 42 U. S. C. § 602 (1964 ed. and Supp. IV), and his approval of such a plan, and only his approval, qualifies the state program for federal financial assistance. 42 U. S. C. § 601 (1964 ed., Supp. IV). So that HEW may determine whether

---

[1] This precise issue was not so clearly and sharply presented in *King* v. *Smith*, 392 U. S. 309 (1968), which I joined. See *id.*, at 317 n. 11, 326 n. 23.

the state plan continues at all times to meet the federal requirements, each State is required by regulation to submit all relevant changes, such as new state statutes, regulations, and court decisions, to HEW for its review. 45 CFR § 201.3. If, after affording the State reasonable notice and an opportunity for a hearing, HEW determines that the state plan does not conform to the federal requirements, the federal agency then has a legal obligation to terminate federal aid to which the State would otherwise be entitled. 42 U. S. C. §§ 604, 1316 (1964 ed., Supp. IV); 45 CFR § 201.5. Waiver by the Secretary of any of the federal requirements is permitted only where the Secretary and state welfare officials have together undertaken a "demonstration" or experimental welfare project. 42 U. S. C. § 1315 (1964 ed., Supp. IV). The administrative procedures that the Secretary must afford a State before denying or curtailing the use of federal funds are elaborated in 42 U. S. C. § 1316 (1964 ed., Supp. IV), and this section also provides that a State can obtain judicial review in a United States court of appeals of an adverse administrative determination.

This unified, coherent scheme for reviewing state welfare rules and practices was established by Congress to ensure that the federal purpose behind AFDC is fully carried out. The statutory provisions evidence a clear intent on the part of Congress to vest in HEW the primary responsibility for interpreting the federal Act and enforcing its requirements against the States. Although the agency's sanction, the power to terminate federal assistance, might seem at first glance to be a harsh and inflexible remedy, Congress wisely saw that in the vast majority of cases a credible threat of termination will be more than sufficient to bring about compliance. These procedures, if followed as Congress intended, would render unnecessary countless lawsuits by welfare recipients. In the case before the Court today it is

undisputed that HEW had by the time of the proceedings in the District Court commenced its own administrative proceedings to determine whether § 131–a conforms to the Social Security Act's provisions. The agency had requested the New York welfare officials to provide detailed information regarding the statute and was preparing to make its statutorily required decision on the conformity or nonconformity of § 131–a. It was at this point, when HEW was in the midst of performing its statutory obligation, that the District Court assumed jurisdiction over petitioners' claim and decided the very state-federal issue then pending before HEW. Both Judge Hays and Judge Lumbard of the Court of Appeals were of the opinion that the District Court abused its discretion in finding that it had jurisdiction over this statutory claim, and both judges relied in part on the pendency of the identical question before the federal agency. 414 F. 2d 170, 176, 181 (1969). Chief Judge Lumbard's reasoning is instructive:

> "[H]ere, as Judge Hays points out, the federal claim seems more apt for initial resolution by the Department of Health, Education and Welfare, than by the courts. The two issues upon a resolution of which this claim turns—the practical effect of § 131–a and the proper construction of § 602 (a)(23) of the Social Security Act—both are exceedingly complex. The briefs and arguments of the parties, and the varying judicial views they have elicited, have demonstrated the wisdom of allowing HEW, with its expertise in the operation of the AFDC program and its experience in reviewing the very technical provisions of state welfare laws, an initial opportunity to consider whether or not § 131–a is in compliance with § 602 (a)(23). This is HEW's responsibility under the Social Security Act, see 42 U. S. C. A. § 1316 (Supp. 1969). I believe that

the district court should have declined to exercise its jurisdiction, thus permitting HEW to determine the statutory claim asserted by plaintiffs, for the Department already had initiated review proceedings concerning § 131–a." 414 F. 2d, at 181.

I agree with the Court of Appeals that the District Court abused its discretion in taking jurisdiction over this case, but I would go further than holding that the District Court's action was a mere abuse of discretion. Ensuring that the federal courts have the benefit of HEW's expertise in the welfare area is an important but by no means the only consideration supporting the limitation of judicial intervention at this stage. Congress has given to HEW the grave responsibility of guaranteeing that in each case where federal AFDC funds are used, federal policies are followed, and it has established procedures through which HEW can enforce the federal interests against the States. I think these congressionally mandated compliance procedures should be the exclusive ones until they have run their course. The explicitness with which Congress set out the HEW compliance procedures without referring to other remedies suggests that such was the congressional intent. But more fundamentally, I think it will be impossible for HEW to fulfill its function under the Social Security Act if its proceedings can be disrupted and its authority undercut by courts which rush to make precisely the same determination that the agency is directed by the Act to make. And in instances when HEW is confronted with a particularly sensitive question, the agency might be delighted to be able to pass on to the courts its statutory responsibility to decide the question. In the long run, then, judicial pre-emption of the agency's rightful responsibility can only lead to the collapse of the enforcement scheme envisioned by Congress, and I fear that this case and others have carried such a

process well along its way. Finally, there is the very important consideration of judicial economy and the prevention of premature and unnecessary lawsuits, particularly at this time when the courts are over-run with litigants on every subject. If courts are permitted to consider the identical questions pending before HEW for its determination, inevitably they will hand down a large number of decisions that could have been mooted if only they had postponed deciding the issues until the administrative proceedings were completed. For all these reasons I would go one step further than the Court of Appeals majority and hold that all judicial examinations of alleged conflicts between state and federal AFDC programs prior to a final HEW decision approving or disapproving the state plan are fundamentally inconsistent with the enforcement scheme created by Congress and hence such suits should be completely precluded. This preclusion of judicial action does not, of course, necessarily mean that the individual welfare recipient has no legal remedies. The precise questions of when and under what circumstances individual welfare recipients can properly seek federal judicial review are not before the Court, however, and I express no views about those issues.[2]

---

[2] The issues are canvassed in Note, Federal Judicial Review of State Welfare Practices, 67 Col. L. Rev. 84 (1967).