Tibursio and Maria ALVARADO, Mary Deleon, Agnes Hanson, Betty Hanson, Dolores Hill, and Corinne Rolo, individually and on behalf of their minor children and all others similarly situated, Plaintiffs,

v.

Wilbur J. SCHMIDT, individually and as Secretary of the Wisconsin Department of Health and Social Services, Franklin Walsh, individually and as Chairman of the Wisconsin Board of Health and Social Services, Joseph E. Baldwin, individually and as Director of the Milwaukee County Department of Public Welfare, and William F. O'Donnell, individually and as Chairman of the Milwaukee County Board of Public Welfare, Defendants.

Civ. A. No. 69–C–210.

United States District Court, W. D. Wisconsin.

Sept. 29, 1970.

James A. Walrath, Richard M. Klein, Eric Schulenburg and Steven H. Steinglass, Milwaukee, Wis., for plaintiffs.

Robert W. Warren, Atty. Gen., and Donald P. Johns, Asst. Atty. Gen., Madison, Wis., for defendants, Wilbur J. Schmidt and Franklin Walsh.

Robert P. Russell, Corporation Counsel and James J. O'Donnell, Deputy Corporation Counsel, Milwaukee, Wis., for defendants, Joseph E. Baldwin and William F. O'Donnell.

## OPINION AND ORDER

Before FAIRCHILD, Circuit Judge, and DOYLE and REYNOLDS, District Judges.

REYNOLDS, District Judge.

This is an action challenging the reduction of AFDC welfare benefits in the State of Wisconsin on the grounds that the reductions are (1) unconstitutional because they unfairly discriminate against the recipients of the AFDC program, and (2) violate federal law.

Plaintiffs and their children receive grants under the Wisconsin Aid to Families with Dependent Children ("AFDC") program and bring this class action on their own behalf and on behalf of all persons who are elibigle for such grants. The defendants are officials of the State of Wisconsin and Milwaukee County and will hereinafter be referred to as the "state."

The statutes involved are:

1. Section 49.19(11) of the Wisconsin Statutes, enacted in August of 1969, which provides in pertinent part as follows:

> " * * * during the 1969–71 fiscal biennium the state-wide average of money grants to persons on aid to families with dependent children, living with legally responsible relatives, shall not exceed 120% of the national average of such aid, as determined from federal statistics. * * * "

2. Section 402(a) (23), 42 U.S.C. § 602(a) (23), (Supp. IV 1968) of the Federal Social Security Act of 1935, which was enacted on January 2, 1968, and provides:

> "(a) A State plan for aid and services to needy families with children must * * * (23) provide that by July 1, 1969, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and any maximums that the State imposes on the amount of aid paid to

families will have been proportionately adjusted."

The plaintiffs challenge the validity of § 49.19(11) of the Wisconsin Statutes in that it violates the equal protection clause of the Fourteenth Amendment of the Constitution by reducing the level of benefits to AFDC recipients while maintaining previous benefit levels for recipients of the three other "categorical aid programs," i. e. Aid to the Blind, Aid to the Permanently and Totally Disabled, and Old Age Assistance.

Plaintiffs further challenge the validity of the state AFDC plan (adopted November 1, 1969, and amended on November 28, 1969—hereinafter referred to as the "November 1969 plan") which implements § 49.19(11) of the Wisconsin Statutes in that the plan violates § 402(a) (23) because (1) it establishes a "maximum" on the amount of aid paid which lowers the amount of benefits paid and is not related to the "standard of need," hereinafter described, and (2) the standard of need in the November 1969 plan does not comply with the standard of need requirements of § 402(a) (23). Specifically, in this regard, plaintiffs contend that under the November 1969 plan, the state has (a) lowered the standard of need by eliminating some items and limiting the availability of other items, (b) failed to make cost-of-living increases for all items formerly in the standard of need, (c) failed to implement a revised standard of need by July 1, 1969, and (d) failed to compute the cost-of-living increases over the correct period of time.

Plaintiffs seek declaratory and injunctive relief. They seek relief enjoining the operation of § 49.19(11) as implemented by the November 1969 plan and an award of retroactive payments of money grants wrongfully withheld pursuant to § 49.19(11) and the plan.

This action was commenced in the United States District Court for the Western District of Wisconsin. A hearing on plaintiffs' motion for a temporary restraining order was held, and the court, by its order dated September 23, 1969, denied that motion. On the same day, the district judge wrote to the chief judge of the court of appeals indicating that plaintiffs had made application for injunctive relief restraining the enforcement of a state statute on the ground that such statute violated the Fourteenth Amendment and that the contentions of the plaintiffs were not frivolous or insubstantial. On September 25, 1969, a three-judge court was designated to hear and determine the action. The case was argued before the three-judge court on December 5, 1969.

We find for reasons set forth in part II that the present November 1969 plan does not fulfill the requirements of § 402(a) (23) of the Federal Social Security Act, and, therefore, it is unnecessary for us to consider the constitutional question.

## I. JURISDICTION

▇ We must consider the question of whether the plaintiffs are asserting the deprivation of a constitutional right, privilege, or immunity within the meaning of 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3) and (4). In considering this question it is not necessary to decide whether there is a constitutional right to food, shelter, and other necessities of life. *Compare* Shapiro v. Thompson, 394 U.S. 618, 627, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), and Rothstein v. Wyman, 303 F.Supp. 339, 346–347 (S.D. N.Y.1969), with Rosado v. Wyman, 414 F.2d 170, 177 (2d Cir. 1969), and Jefferson v. Hackney, 304 F.Supp. 1332, 1335 (N.D.Tex.1969). It is only necessary to note that the Supreme Court found jurisdiction over causes of action based on the equal protection clause of the Fourteenth Amendment in cases where the right asserted is not distinguishable from the right asserted in this case. King v. Smith, 392 U.S. 309, 312, n. 3, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970).

▇ In an action to enjoin enforcement of a state statute based on 42 U.S.C. § 1983 with jurisdiction claimed

under 28 U.S.C. § 1343(3) and (4), where the rights, privileges, or immunities sought to be redressed are those secured by the equal protection clause of the Fourteenth Amendment, a three-judge district court has jurisdiction only if the constitutional claim is not insubstantial. Solman v. Shapiro, 300 F.Supp. 409 (D.Conn.1969), aff'd per curiam 396 U.S. 5, 90 S.Ct. 25, 24 L.Ed.2d 5 (1969); Doe v. Shapiro, 302 F.Supp. 761 (D.Conn.1969); Utica Mutual Insurance Co. v. Vincent, 375 F.2d 129 (2d Cir. 1967). The criterion of substantiality of the constitutional claim, as indicated by the *Utica* court, is found in the Supreme Court's statement:

> "The lack of substantiality in a federal question may appear either because it is obviously without merit or because its unsoundness so clearly results from the previous decisions of this Court as to foreclose the subject." California Water Service Co. v. City of Redding, 304 U.S. 252, 255, 58 S.Ct. 865, 867, 82 L.Ed. 1323 (1938).

■ Plaintiffs claim that the reduction in AFDC payments without a like reduction in payments to Aid to the Blind, Aid to the Permanently and Totally Disabled, and Old Age Assistance program recipients is a violation of the equal protection clause of the Constitution. We find that this claim is neither obviously without merit nor an issue foreclosed by prior Supreme Court decisions.

Two recent three-judge court decisions have considered at length very similar equal protection claims. Lampton v. Bonin, 299 F.Supp. 336 (E.D.La.1969),

and Jefferson v. Hackney, 304 F.Supp. 1332 (N.D.Tex.1969). While in both cases it was held that reductions in payments to AFDC recipients without commensurate reductions to other welfare recipients did not violate the equal protection clause, the fact that the courts found the equal protection claim to be not insubstantial for purposes of jurisdiction and discussed the issue at length is authority that the equal protection claim of plaintiffs in the instant case is not insubstantial. Moreover, the Supreme Court in *Rosado* found a similar equal protection claim to be not insubstantial for jurisdictional purposes. Therefore, this court has jurisdiction over plaintiffs' equal protection claim.[1]

Having found that jurisdiction is proper over the constitutional issue, it must now be determined whether pendent jurisdiction is proper over the statutory claim and, if so, whether the court retains jurisdiction when it decides the case on the statutory claim and does not reach the constitutional issue.

■■ It is well settled that once the jurisdiction of a federal district court has been properly invoked, the court acquires jurisdiction to decide all related claims arising out of the same transaction or dispute. United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933); Gulickson v. Forest, 290 F.Supp. 457 (E.D.N.Y.1968). In Florida Lime & Avocado Growers, Inc. v. Jacobsen, 362 U.S. 73, 80, 80 S.Ct. 568, 4 L.Ed.2d 568 (1960), the court said that a properly

1. Subsequent to the commencement of this lawsuit, the United States Supreme Court decided the case of Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). *Dandridge* involved an equal protection challenge to the family maximum grant provisions of the Maryland AFDC program. The *Dandridge* opinion dealt with the equal protection claim on its merits rather than as to its jurisdictional sufficiency. We are not agreed as to what the impact of *Dandridge* (read in conjunction with *Rosado*) might

have been on the jurisdictional sufficiency of plaintiffs' constitutional challenges in this case. (See Money v. Swank, 432 F.2d 1140 (7th Cir. 1970), for recent Seventh Circuit case dealing with the impact of *Dandridge*.) However, we need not reach the issue here for the reason that jurisdiction in this case was properly founded before the decision in *Dandridge*. (See also, for discussion of continuing jurisdictional sufficiency once established, Rosado v. Wyman, 397 U.S. 397, 402, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970).)

convened three-judge district court has jurisdiction "over *all* claims" raised against a state statute. In both *Lampton* and *Jefferson,* the courts considered very similar statutory and constitutional claims and exercised pendent jurisdiction over the statutory claim. In addition, the statutory question in the instant case is so essentially one "of federal policy that the argument for exercise of pendent jurisdiction is particularly strong." United Mine Workers, supra, 383 U.S. at 727, 86 S.Ct. at 1139. See *Rosado,* 397 U.S. at 403–404, 90 S.Ct. 1207. In *Rosado,* the court exercised pendent jurisdiction over a statutory claim involving the compatibility of a state statute with § 402(a) (23). In light of this authority, and the fact that plaintiffs' statutory claim clearly arises out of the same dispute as does the constitutional claim, we find that the court has pendent jurisdiction over the statutory claim.[2]

■ The three-judge district court is "obliged to adjudicate [the] statutory claim in preference to deciding the original constitutional claim" and need not retain "jurisdiction over the primary claim at all stages as a prerequisite to resolution of the pendent claim." *Rosado,* 397 U.S. at 402 and 405, 90 S.Ct. at 1212 and 1214. Therefore, this court retains pendent jurisdiction over plaintiffs' statutory claim even though it does not reach the jurisdiction-founding constitutional claim.

## II. THE STATUTORY CLAIM

We now consider the merits of the case which is whether or not § 49.19(11) of the Wisconsin Statutes as implemented by the state's November 1969 plan complies with § 402(a) (23) of the federal statute as interpreted by the United States Supreme Court in the case of Rosado v. Wyman, supra.

### A. *Background*

AFDC is one of four "categorical assistance" programs established by the Social Security Act of 1935. Each state participates in the program and receives payments from the federal government in varying amounts on a matching fund basis. Participating states must comply with the terms of federal legislation, King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), but have traditionally been given discretion to pay as little or as much in benefits as they choose, and there are significant differences in the level of benefits paid in different states. *Rosado,* 397 U.S. at 408, 90 S.Ct. 1207.

In determining what the benefits to a family will be, the state considers two factors. First, a "standard of need" is established which is supposed to represent the minimum subsistence level. The standard of need is determined by computing the cost of items considered necessary for subsistence. This standard of need serves also as a yardstick to determine who is eligible for benefits. Second, the state determines what level of benefits it wishes to actually provide the recipients.

Congress has allowed the states considerable discretion in making the determinations involved in the various state AFDC programs. Some states include items in their standard of need that others do not, and judgments vary as to the cost of the items included. The level of benefits actually paid varies as well. In some states it equals 100% of the standard of need, as was true in

---

2. As to the question of the standing of welfare recipients to challenge the state's compliance with federal statutory requirements; the Supreme Court in *Rosado* commented at page 420, 90 S.Ct. at page 1222. "We have considered and rejected the argument that a federal court is without power to review state welfare provisions or prohibit the use of federal funds by the States in view of the fact that Con-

gress has lodged in the Department of HEW the power to cut off federal funds for noncompliance with statutory requirements. We are most reluctant to assume Congress has closed the avenue of effective judicial review to those individuals most directly affected by the administration of its program. * * *" Plaintiffs in the instant action have the requisite standing.

Wisconsin before enactment of § 49.19 (11) in August of 1969. Others impose dollar maximums on the level of benefits available to an individual or family. "Such maximums establish the upper limit irrespective of how far short the limitation may fall of the theoretical standard of need." *Rosado*, supra, at 409, 90 S.Ct. at 1216. Other states limit payments by imposing a system of "ratable reductions" whereby recipients receive a fixed percentage of the standard of need.

When Wisconsin's level of benefits equaled 100% of its standard of need, they amounted to from 130% to 140% of the national average of such benefits. The effect of § 49.19(11), which limited the average of such benefits in Wisconsin to 120% of the national average of AFDC benefits, was to reduce the level of benefits to a level equal to approximately 80% to 85% of the standard of need.

Before August 1969, Wisconsin determined the standard of need for the state AFDC program by combining three factors:

1. The "combined allowance" which represented the statewide level of need for food, clothing, personal expense, fuel, utilities, regular school expenses, and household supplies. This level varied according to family size, whether or not the costs of utilities and fuel were separate from rent, and the age of the children.

2. The "shelter allowance" which represented rent or expenses related to ownership of real property.

3. The "special need allowances" which represented "unusual" needs such as clothing repair, laundry, telephone, child care, clothing replacements, household replacements, moving expenses, and transportation. These "special need items" were generally available on an "as needed" basis.

Thus, the standard of need for any particular family, under the old plan, was determined by adding the combined allowance, shelter allowance, and any special need allowance figures. From this total, outside income (called "budgetable income"), if any, was subtracted leaving the total need of the family.

The level of benefits under the old plan was equal to the standard of need if there was no budgetable income to subtract. Thus, under the old plan, the state used its standards to determine what the need for a particular family was and then paid it.

The standard of need in the new plan of November 1969 is called the "Updated Combined Allowance." (See Col. II, Attachment A, Appendix Item # 1.) This new standard of need contains certain elements formerly present in the old combined allowance which have been revised upward in amount. However, as will be explained more fully later, this new standard of need differs radically from the standard of need under the old plan in that items have been eliminated, either actually or in effect, and the new standard of need is not used in the same manner as the old standard. (A more detailed discussion of standard of need issues appears later in this opinion at pages 1037–1040.

The level of benefits under the November 1969 plan, rather than equaling whatever the state determines a family's need to be, is determined by adding amounts potentially available from four "allowances." These allowances are designed to assure that the level of benefits stays within the maximum of 120% of the national average of AFDC benefits which is required by § 49.19(11). These four allowances are as follows:

1. The "basic allowance" which covers items formerly included in the old combined allowance as well as certain items which were formerly classified as special need items (for an explanation of how the basis allowance is computed, see page 1037).

2. The "housing allowance" which is based on the amount of rent paid in September 1969 or on county shelter maximums.

3. The "education and rehabilitation allowance" which includes several items

such as school fees, education, and training costs for adults, in-home services, and moving expenses. These items were formerly classified as special needs under the old plan and were available largely as needed.

4. The "emergency allowance" which includes such items as food, fuel, clothing, and household replacements. These replacement items were formerly available "as needed" under the special need allowance. Now they are available only at the time of initial application for the AFDC program or in the case of fire, flood, or gross mismanagement.

In the November 1969 plan, the standard of need was revised upward but no longer utilized to determine the level of benefits. The level of benefits was instead determined by combining amounts potentially available under four allowances. These allowances are designed to keep the level of benefits within the 120% national average maximum imposed by § 49.19(11). Thus, the level of benefits under the November 1969 plan, instead of being equal to the standard of need, is considerably less than the standard of need.

The purpose of § 49.19(11) was to substantially reduce the level of benefits paid to Wisconsin AFDC mothers and their children. This statute, through its implementing November 1969 plan, has accomplished its purpose. It is undisputed that the result of the November 1969 plan has been to reduce amount of money grants paid to AFDC recipients.

### B. *The Meaning of the Federal Statute*

The Supreme Court in *Rosado* has settled the serious controversy concerning the meaning of § 402(a) (23).[3] Mr. Justice Harlan, speaking for the court,

commented at pages 412–414, 90 S.Ct. page 1218:

"Reverting to the language of § 402(a) (23) we find two separate mandates: first, the States must re-evaluate the component factors that compose their need equation; and, second, any 'maximums' must be adjusted.

"We think two broad purposes may be ascribed to § 402(a) (23): First, to require States to face up realistically to the magnitude of the public assistance requirement and lay bare the extent to which their programs fall short of fulfilling actual need; second, to prod the States to apportion their payments on a more equitable basis. Consistent with this interpretation of § 402(a) (23), a State may, after recomputing its standard of need, pare down payments to accommodate budgetary realities by reducing the percent of benefits paid or switching to a percent reduction system, but it may not obscure the *actual* standard of need.

"The congressional purpose we discern does not render § 402(a) (23) a meaningless exercise in 'bookkeeping.' * * * In § 402(a) (23) Congress has spoken in favor of increases in AFDC payments. While Congress rejected the mandatory adjustment provision in the administration bill, it embodied in legislation the cost-of-living exercise which has both practical and political consequences.

"It has the effect of requiring the States to recognize and accept the responsibility for those additional individuals whose income falls short of the standard of need as computed in light of economic realities and to place them among those eligible for the care and training provisions. Secondly, while it leaves the States free to ef-

---

3. For varying interpretations of § 402(a) (23), see Rosado v. Wyman, 304 F.Supp. 1356 (E.D.N.Y.1969), reversed 414 F.2d 170 (2d Cir. 1969); Lampton v. Bonin,

299 F.Supp. 336 (E.D.La.1969); Lampton v. Bonin, 304 F.Supp. 1384 (E.D. La.1969); Jefferson v. Hackney, 304 F. Supp. 1332 (N.D.Tex.1969).

fect downward adjustments in the level of benefits paid, it accomplishes within that framework the goal, however modest, of forcing a State to accept the political consequence of such a cutback and bringing to light the true extent to which actual assistance falls short of the minimum acceptable. Lastly, by imposing on those States that desire to maintain 'maximums' the requirement of an appropriate adjustment, Congress has introduced an incentive to abandon a flat 'maximum' system, thereby encouraging those States desirous of containing their welfare budget to shift to a percentage system which will more equitably apportion those funds in fact allocated for welfare and also more accurately reflect the real measure of public assistance being given."

This court must evaluate the legality of Wisconsin's November 1969 plan in light of § 402(a) (23) as interpreted by the *Rosado* court.

### C. *Issues*

#### (1) *The 120% Maximum*

■ The central issue of this case is whether the limitation of AFDC benefits to 120% of the national average of such benefits, pursuant to § 49.19(11) and the November 1969 plan, has imposed a "maximum" on AFDC payments in Wisconsin which violates § 402(a) (23).

The *Rosado* court, at page 409, 90 S.Ct. at page 1216, defines a system of maximums as one which "establish[es] the upper limit irrespective of how far short the limitation may fall of the theoretical standard of need." We find that to limit specifically the level of individual benefits in Wisconsin to 120% of the national average is to impose a "maximum" within the meaning of § 402(a) (23), and that this particular "maximum" violates § 402(a)( 23).

While the *Rosado* court dealt primarily with § 402(a) (23) as it applied to AFDC "standard of need" requirements, the opinion also deals explicitly with the purpose of the statute and the general effect it was designed to have on state AFDC plans. As noted above, the court found two broad purposes underlying § 402(a) (23): (1) "to require States to face up realistically to the magnitude of the public assistance requirement and lay bare the extent to which their programs fall short of fulfilling actual need" and (2) "to prod the States to apportion their payments on a more equitable basis." The court recognized that a state could, after raising its standard of need to take account of cost-of-living changes, "pare down payments to accommodate budgetary realities by reducing the percent of benefits paid or switching to a percent reduction system, but it *may not obscure the actual standard of need."* (Emphasis supplied.) The court then described the effects that § 402(a) (23) would have on state AFDC plans, including: (1) " * * * while it leaves the States free to effect downward adjustment in the level of benefits paid, it accomplishes within that framework the goal, however modest, of forcing a State to accept the political consequences of such a cutback and bringing to light the true extent to which actual assistance falls short of the minimum acceptable" and (2) " * * * by imposing on those States that desire to maintain 'maximums' the requirement of an appropriate adjustment, Congress has introduced an incentive to abandon a flat 'maximum' system, thereby encouraging those States desirous of containing their welfare budget to shift to a percentage system which will more equitably apportion those funds in fact allocated for welfare and also more accurately reflect the real measure of public assistance being given."

As previously stated, prior to the enactment of § 49.19(11) and its implementation by the state's November 1969 plan, Wisconsin paid AFDC benefits at 100% of the state standard of need which amounted to between 130% and 140% of the national average of such payments. The level of benefits is now

limited to a maximum of 120% of the national average which works out mathematically to be about 85% of the standard of need.

The 120% maximum employed by Wisconsin in its November 1969 plan is contrary to the purpose, and avoids the intended effects of § 402(a) (23).

The *Rosado* court stated that a state was free to pare down benefit levels but in so doing "it may not obscure the actual standard of need." In *reducing* benefits by means of the 120% maximum, by relating benefit levels to the national average, Wisconsin has completely "obscured" the state standard of need. Section 402(a) (23) makes clear that if a state chooses to *reduce* benefit levels, the method employed must be related to the standard of need; otherwise, the standard of need is obscured. The Wisconsin maximum is not related to the state standard of need but rather to the national average of AFDC benefits. The state standard of need is completely obscured. Thus, Wisconsin avoids one of the intended effects of the federal statute: " * * * the goal, however modest, of forcing a State to accept the political consequence of such a cutback and bringing to light the true extent to which actual assistance falls short of the minimum acceptable." *Rosado* at 413, 90 S.Ct. at 1218. Wisconsin has been able to give the appearance of generosity by paying AFDC recipients 120% of the national average of benefits while, in fact, the level of benefits is significantly below the level which the state itself has determined is necessary for subsistence. Such a deceptive mode of reducing benefits is not permitted by the federal statute.

■ Moreover, the method of reducing benefits employed by Wisconsin avoids the intended effect of providing states with an incentive to abandon a system of "maximums" and to adopt a percentage reduction system. Any state which had a maximum on July 1, 1969, was required by the federal statute to make a proportionate adjustment of that maximum to take account of changes in living costs. This would have had the effect of increasing benefit levels in states employing maximums. This requirement of raising benefit levels if a state chose to use a maximum system is the incentive spoken of in *Rosado* to abandon maximums if a state desired to keep its payments down. In light of this intended effect of § 402(a) (23), it would follow that if a state elects after July 1, 1969, for the first time to impose a maximum, as Wisconsin has elected to do, the newly initiated maximum may not have the effect of reducing the earlier level of actual benefits. A state is not prevented from adopting the device of a maximum after July 1, 1969, nor is a state prevented from reducing its actual level of benefits. But just as a state which has earlier used a maximum may not reduce its maximum, so a state which first elects to use a maximum after July 1, 1969, may not employ a maximum as the device for reducing the earlier level of actual benefits. Such a reduction in the level of benefits can only be accomplished by a "ratable reduction"; that is, by a candid and revelatory declaration that henceforth the level of actual benefits shall be only a stated percentage of the standard of need.

Thus, Wisconsin's November 1969 plan, having employed a maximum to reduce benefits, has violated two of the intended purposes of § 402(a) (23). First, the standard of need in Wisconsin is totally "obscured" by the new maximum because, unlike a ratable or percentage reduction, the benefit level in Wisconsin under the maximum is related to 120% of the national average rather than to a percentage of the state's standard of need. Second, Wisconsin's 120% maximum avoids the intended effect of discouraging the utilization of maximums. While Wisconsin is free to reduce benefits to AFDC mothers and their children, it may not do so after July 1, 1969, by using a maximum as it has done in the November 1969 plan. The congressional intent was to discourage maximums, not to provide an

incentive for their adoption. We find for the above reasons that the manner which Wisconsin has chosen to reduce benefits is impermissible under § 402 (a) (23).

(2) *Standard of Need Issues*

Plaintiffs also allege numerous violations of the federal statute and federal regulations with regard to the character and use of Wisconsin's standard of need in the November 1969 plan. Four principal issues will be dealt with:

(a) The failure of the state to use the revised standard of need to determine eligibility;

(b) The failure of the state to reprice all the items in the standard of need;

(c) The issue of the proper period of time over which to make cost-of-living adjustments in the need standard; and

(d) The issue of the content of the standard of need itself.

[Discussion of standard of need issues can perhaps be simplified by a brief illustration of how an AFDC "basic allowance" figure for a family is arrived at under the November 1969 plan. In Attachment A (Appendix Item #1), Wisconsin shows five elements under a heading entitled "Standards of Assistance." These elements are: (I) The old 1967 "Combined Allowance" which was the old standard of need, (II) the new "Updated Combined Allowance" which is the new standard of need, (III) the "Rated Reduction" which is an $8 per person reduction stemming from the 120% maximum in the statute, (IV) the "Amount for Common Items" which is an add-in of $9, $11, or $13 per family according to family size and which is supposed to compensate for items which were formerly special need items but now must come out of the recipient's basic allowance, and (V) the "Current Combined (Basic) Allowance" which is the level of benefits arrived at for any particular family.

With the exception of the housing allowance and a possible amount from the emergency or rehabilitation allowances, the "basic allowance" is what an AFDC family receives in a given month. It is their grant. In computing the basic allowance, only three of the above-described elements listed on Attachment A are utilized. Taking a family of four for illustration purposes, the state takes the old "Combined Allowance" figure (Col. I) of $149 as a starting figure. From the $149, $8 per person, or $32 for a family of four, is subtracted to effect the "Rated Reduction," leaving the sum of $117 (Col. III). Next, the amount for "Common Items" (Col. IV) is added in, in this case $9, yielding a final figure of $126 which is the basic allowance (Col. V). It is important to note that the new standard of need (Col. II) is not used at all in computing the level of the basic allowance.]

(a) We are unable to discern any manner in which the standard of need in the November 1969 plan has been used by the state. As noted in section C(1) above, payment levels are not "related" to the revised standard of need but, rather, are a function of the 120% limitation imposed by § 49.19(11). The revised standard of need does not appear to be utilized whatsoever in computing the AFDC grant.[4] Further, it is clear that one of the functions of a standard of need is to serve as "a yardstick for measuring who is eligible for public assistance." *Rosado* at 408, 90 S.Ct. at 1216. Having this function, when the standard of need is adjusted to reflect cost-of-living changes, as required by the federal statute, the adjustment has an impact on the determination of eligibility. The *Rosado* court, discussing the purpose and intended impact of § 402 (a) (23), said at page 413, 90 S.Ct. at page 1218:

"It has the effect of requiring the States to recognize and accept the responsibility for those additional individuals whose income falls short of the standard of need as computed in light of economic realities and to place them among those eligible for the care and training provisions. * * *"

---

4. See discussion at page 1037.

**1038**

■ The state has not used the revised standard of need to determine eligibility for AFDC recipients in Wisconsin.[5] Instead of using the revised standard of need to determine eligibility, the state has used the payment level itself which the state calls the "basic allowance." Thus, instead of using the figure of $167 for a family of four, the state has used the figure of $126.[6] It is important to note that this procedure for determining eligibility has real consequences for poor people in Wisconsin. By using a lower standard to determine eligibility, the state has undoubtedly denied access to the AFDC program to many persons who would be eligibile were the correct, revised standard utilized. The court in *Rosado* found that § 402(a) (23) was more than merely a "meaningless exercise in 'bookkeeping.'" If states were permitted to revise their standard of need and then simply not use it, § 402(a) (23) would indeed be rendered a futile gesture on the part of Congress. Accordingly, we find that in not using its revised standard of need to determine eligibility for the AFDC program in Wisconsin, the state has violated the federal statute.

■ (b) Section 402(a) (23) requires that all the items which make up the state's old standard of need be adjusted by July 1, 1969, to reflect cost-of-living increases. This appears from the face of the statute, the *Rosado* opinion, and HEW interpretations and regulations. The court in *Rosado* said that regardless of what methods are undertaken to pare down the level of benefits or restructure the standard of need itself, "all factors in the old equation" must be accounted for and fairly priced. It is con-

ceded by the state that items such as clothing and other items formerly classified as "special need" items in the former standard of need have not been repriced. In addition, while the state has made the required adjustments for some other items, the adjustments were not made by July 1, 1969, as required by the federal law. Hence, the state's failure to make timely adjustments, or to make the required adjustments at all, constitutes a violation of § 402(a) (23).

With regard to repricing all old standard of need items, it appears that the state takes the position that this is an impossible task where there formerly was no maximum amount for the items in question. The *Rosado* court spoke of all standard of need items being "fairly priced." We find no reason why "fair" prices could not be ascertained for items in the former standard of need even if previously the items were allowed as needed by the recipient.

■ (c) Plaintiffs further contend that the cost-of-living increases in the standard of need must reflect the cost of living as of July 1, 1969. The state claims that the statute requires only that any date between the enactment of § 402 (a) (23) (January 2, 1968) and its effective date, July 1, 1969, be used. The state made adjustments for certain items in the standard of need in September 1968; that is, they used the period of July 1967 to September 1968 as the period through which to measure cost-of-living increases. It is our opinion that the plain language of the statute requires only that the adjustments in the standard of need be made sometime before July 1, 1969.[7] Hence, in choosing the pe-

---

5. See pages 11 and 12 of defendants' supplemental brief wherein it is admitted that the basic allowance is utilized to determine eligibility; see also pages 23 and 39 of deposition of Frank Newgent taken April 24, 1970, wherein Mr. Newgent states that the basic allowance was used to determine eligibility and that the revised standard of need had not been implemented to determine eligibility.

6. See Attachment A, plan submitted November 28, 1969, Item #1, Appendix, supra.

7. Although § 402(a) (23) was not compulsory until July 1, 1969, it was operative as of the date of enactment in that it could be satisfied by an appropriate adjustment at any time between those dates. See Lampton v. Bonin, 299 F. Supp. 336, 347 (E.D.La.1969). Congress realized that some state legislatures meet

riod of time that it chose to measure changes in cost of living, the state did not thereby violate § 402(a) (23).

(d) Finally, there is the issue of the content of the new standard of need itself. The court in *Rosado* considered a change in New York's AFDC plan that employed a system of family maximum grants which did not include certain "special grants" formerly in the state standard of need. The Court commented at page 417, 90 S.Ct. at page 1220:

> "While § 402(a) (23) does not prevent the States pursuing what is beyond dispute the laudable goal of administrative efficiency, we think Congress has foreclosed them from achieving this purpose at the expense of significantly *reducing the content of their standard of need.* * * *" (Emphasis added.)

The Court noted that such items as laundry and telephones which had been included in the New York standard of need as "special grants" were not included in the standard of need in the new program and held at page 419, 90 S.Ct. at page 1221:

> " * * * Section 402(a) (23) invalidates any state program that substantially alters the content of the standard of need in such a way that it is less than it was prior to the enactment of § 402(a) (23), unless a State can demonstrate that the items formerly included no longer constituted part of the reality of existence for the majority of welfare recipients. * *"

The court found that by deleting items formerly in the standard of need and not making provision for the "special grants" in the new standard of need, New York had violated § 402(a) (23). " * * * New York, has, in effect, im-

permissibly lowered its standard of need by eliminating items that were included prior to the enactment of § 402(a) (23)." [8] *Rosado* at 416, 90 S.Ct. at 1219.

As noted earlier, the *Rosado* court found the two purposes of § 402(a) (23) as being: First, to force states to "face up realistically to the magnitude of the public assistance requirement and *lay bare* the extent to which their programs fall short of fulfilling actual need, and second, "to prod the States to apportion their payments on a more equitable basis." (Emphasis supplied.) It follows from these articulated purposes set forth in *Rosado* that a state may not reduce the content of its standard of need when making the adjustments required by the federal statute. If, before making the adjustments required by § 402(a) (23), a state employed a standard of need which contained certain items, it would clearly frustrate the purpose of the federal statute to permit the state to eliminate items from the old standard of need and thereby avoid the duty of realistically adjusting them. The federal statute seeks to have the states set forth the standard of need, updated in price as to its component parts, to reflect the actual subsistence level of need. If a state then chooses to lower its level of benefits, as the statute permits by proper procedures, this full, realistic statement of what constitutes need then "lays bare" the extent to whch moneys allocated by the state fall short of providing for the needs of the AFDC recipients.

It is undisputed that the state has eliminated certain items from its former standard of need. Many items which were formerly "special need" items have been transferred and placed under other allowances. The defendants seek to jus-

---

only every other year and that July 1, 1969, was the first date by which all states could reasonably be expected to comply. " * * * Recognizing, however, that the need for increased payments was immediate and not 1½ years prospective, Congress framed section 402(a) (23) to permit states to enact appropriate increases before July 1, 1969, and still

comply with the requirements of the statute." Lampton v. Bonin, 299 F.Supp. 336, 347–348 (E.D.La.1969).

8. See also 45 C.F.R. § 233.20(a) (2) (ii), 34 Fed.Reg. 1394 (1969), which says that a state may not reduce the "content" of the state standard of need by combining items in the standard.

tify this elimination and transfer of special need items apparently on two bases: First, that certain items were consolidated on the basis of statistical averages, and second, that certain former special need items can now best be viewed as regular and recurring needs and, therefore, can be transferred to the basic allowance under the new plan.

The *Rosado* court stated that it was permissible for a state to "redefine its method for determining need" consistent with the dictates of § 402(a) (23), but only if certain methods were followed. With regard to consolidation of standard of need items, the Court commented at page 419, 90 S.Ct. at page 1221:

" * * * Providing all factors in the old equation are accounted for and fairly priced and providing the consolidation on a statistical basis reflects a fair averaging, a State may, of course, consistently with § 402(a) (23) redefine its method for determining need. * * * "

The state claims it has consolidated certain items on the basis of statistical averages. While it appears that the $9, $11, or $13 add-in to the basic allowance is based upon an averaging of what these items had formerly cost, and the averaging may, in fact, be "fair," it does not appear that the figures for the consolidated items are a part of the state's new standard of need; that is, the "basic allowance" is not the state's *standard of need* for AFDC recipients.[9] Rather, the basic allowance is the end product, the payment level itself which results from additions to and deductions from the old standard of need. While a state may consolidate standard of need items on the

basis of a fair statistical averaging, all the items should be provided for, even if on a consolidated basis, in the new standard of need. This is necessary so that the standard of need may fulfill the statutory purpose of demonstrating the extent to which the level of benefits falls short of that standard of need and of determining eligibility.

The *Rosado* Court said at page 415, 90 S.Ct. at page 1219, that "a State may not redefine its standard of need in such a way that it circumnavigates around the requirement of re-evaluating its existing standard."[10] The state of the factual record before this court regarding special need items is less than adequate. Certain items in the state's former standard of need may have been eliminated and not accounted for at all. Certain other items have been transferred to other allowances created by the new plan but apparently are not provided for at all or are provided for in the basic allowance but not in the standard of need. Thus, Wisconsin apparently has contracted its standard of need by reducing its content and has thereby failed to completely re-evaluate its previously existing standard of need. Because the factual record regarding the content of the November 1969 standard of need vis a vis the old standard of need is inadequate, the parties may make a more detailed factual presentation regarding this issue upon remand of the damage issue to the single judge, pursuant to the following section of this opinion.

### III. REMEDY

#### A

While it is not the purpose of this or any federal court to administer state wel-

---

9. See state plan amendment submitted November 28, 1969, Attachment A therein, Appendix Item #1, supra; see also with regard to the averaging in state plan Progress Report on Limitations on AFDC Grants, pages 1–2, appendix to defendants' supplemental brief.

10. See also HEW state letters of October 17, 1969 and May 25, 1970, appendix to plaintiffs' supplemental brief, wherein HEW indicates that where a state has chosen to consolidate items in the standard of need, "The updated revised or consolidated standard should be compatible in content and cost with the previous standards."

fare programs, courts must insure that where federal moneys are involved federal law is not violated by the state program. We recognize the difficulty of the task of administering a state public assistance program when the legislature has not appropriated enough money.

The *Rosado* court, at pages 422–423, 90 S.Ct. at pages 1222–1223, discussed at length the role of the federal courts in cases involving challenges to state welfare programs:

"* * * While we view with concern the escalating involvement of federal courts in this highly complicated area of welfare benefits, one that should be formally placed under the supervision of HEW, at least in the first instance, we find not the slightest indication that Congress meant to deprive federal courts of their traditional jurisdiction to hear and decide federal questions in this field. It is, of course, no part of the business of this Court to evaluate, apart from federal constitutional or statutory challenge, the merits or wisdom of any welfare programs, whether state or federal, in the large or in the particular. It is, on the other hand, peculiarly part of the duty of this tribunal, no less in the welfare field than in other areas of the law, to resolve disputes as to whether federal funds allocated to the States are being expended in consonance with the conditions that Congress has attached to their use. As Mr. Justice Cardozo stated, speaking for the Court in Helvering v. Davis, 301 U.S. 619, 645 [57 S.Ct. 904, 81 L.Ed. 1307] (1937): 'When [federal] money is spent to promote the general welfare, the concept of welfare or the opposite is shaped by Congress, not the states.' Cf. Lassen v. Arizona ex rel. Arizona Highway Dept., 385 U.S. 458 [87 S.Ct. 584, 17 L.Ed.2d 515] (1967)."

The *Rosado* court found that New York's AFDC plan violated § 402(a) (23) and that federal funds were being "allocated and paid in a manner contrary to that intended by Congress." *Rosado* at 421, 90 S.Ct. at 1222. The Court said at page 420, 90 S.Ct. at page 1221:

"New York is, of course, in no way prohibited from using only *state* funds according to whatever plan it chooses, providing it violates no provision of the Constitution. It follows, however, from our conclusion that New York's program is incompatible with § 402(a) (23), that petitioners are entitled to declaratory relief and an appropriate injunction by the District Court against the payment of *federal* monies according to the new schedules, should the State not develop a conforming plan within a reasonable period of time."

 While a plan that reduces benefits, whether statutory or administrative, that is unrelated to the standard of need is illegal, we have proceeded to leave open the possibility that an administrative plan might be developed by the State of Wisconsin which could conform to both the Wisconsin and federal statutes.[11] Therefore, we now make no finding as to whether the Wisconsin statute itself, i. e. § 49.19(11), violates the Social Security Act. But we do find that the Wisconsin November 1969 plan, which implemented § 49.19(11), is incompatible with § 402 (a) (23) of the federal statute and that the plaintiffs, therefore, are entitled to a declaratory judgment so holding as to the November 1969 plan; and if the state should fail to develop a plan which is compatible with § 402(a) (23) and § 49.-19(11) within a reasonable period of time, then the plaintiffs would be entitled to injunctive relief with regard to the state statute itself.

---

11. We take note of the fact, as mentioned in defendants' supplemental brief, that Wisconsin has apparently adopted a revised plan which is to be implemented in July 1970.

**B**

In addition to injunctive and declaratory relief, plaintiffs also seek retroactive payments of AFDC money grants wrongfully withheld from them, and the class of persons whom they represent, as a result of the state's violation of § 402 (a) (23).

In several recent cases where state welfare laws or regulations were challenged by recipients, courts have granted awards of retroactive welfare payments to members of the plaintiff class. See Alvarez v. Hackney, Civil Nos. 68–18–SA and SA 69 CA 128 (W.D.Tex. Sept. 30, 1969); Gaddis v. Wyman, 304 F.Supp. 717 (S.D.N.Y.1969), aff'd sub nom., Wyman v. Bowens, 397 U.S. 49, 90 S.Ct. 813, 25 L.Ed.2d 38 (1970); Brooks v. Yeatman, 311 F.Supp. 364 (M.D.Tex.1970). To deny AFDC recipients payments to which they were legally entitled and which the state wrongfully withheld would be to allow a state to operate an AFDC plan that violated federal statutory requirements with financial impunity. Wisconsin's plan has been in noncompliance with the federal statute since July 1, 1969, and significant amounts of funds have been illegally withheld from the plaintiffs and their class.

However, a determination of the propriety or amount of awards of retroactive payments must await a more thorough development of the facts by the parties. The detailed provisions of the state AFDC plans, which are the subject of this lawsuit, are complicated, and this court does not now have adequate facts on which to award damages. It is, therefore, impossible at present to calculate the amount of payments illegally withheld from AFDC recipients. Therefore, the amount of retroactive payments and whether and to whom they should be paid is turned over to the single-judge district court for determination.

It is therefore adjudged that the state AFDC plan (adopted November 1, 1969, and amended November 28, 1969, and referred to in the opinion above as the November 1969 plan), which implements § 49.19(11) of the Wisconsin Statutes, violates the provisions of § 402(a) (23), 42 U.S.C. § 602(a) (23), (Supp. IV 1968) of the Federal Social Security Act.

It is further ordered:

1. If the November 1969 plan is no longer in effect in Wisconsin, then on or before November 13, 1970, defendants are ordered to submit to this three-judge court a detailed exposition of the plan presently in effect in Wisconsin together with a declaration whether the defendants intend to continue to operate under such post-November 1969 plan. Defendants may submit simultaneously a brief in support of the validity of said post-November 1969 plan; plaintiffs may submit an answering brief within thirty (30) days of receipt of defendants' brief; and defendants may submit a reply brief within ten (10) days of receipt of plaintiffs' answering brief. The three-judge court will then proceed to determine whether such post-November 1969 plan complies with the Social Security Act.

2. If defendants fail to submit the detailed exposition permitted in paragraph 1 above, the three-judge court will conclude that defendants are continuing to operate under the November 1969 plan and will enjoin the use of federal funds for the plan then in effect.

3. If the defendants submit the detailed exposition permitted in paragraph 1 above, and if the three-judge court determines that such post-November 1969 plan violates the Social Security Act, then the three-judge court will order the defendants to submit a further revised and conforming plan within forty-five (45) days following such determination.

4. The three-judge court hereby terminates its consideration of the November 1969 plan. The single-judge court will proceed, consistently with this opinion, to determine all questions with respect to retroactive entitlement to benefits by reason of operations under the November 1969 plan.

APPENDIX

[SEAL] State of Wisconsin/DEPARTMENT OF HEALTH & SOCIAL SERVICES

DIVISION OF FAMILY SERVICES
1 WEST WILSON STREET
MADISON, WISCONSIN 53702

REPLY TO
ATTN. OF:

November 28, 1969

Mr. Donald F. Simpson, Regional Commissioner
Social And Rehabilitation Service
Department of Health, Education, and Welfare
433 West Van Buren Street, Room 808
Chicago, Illinois 60607

Dear Mr. Simpson:

This responds to your letter of November 13, 1969 calling attention to the requirement of updating AFDC standards as of July 1, 1969. This letter of interpretation together with two attachments constitute our State plan amendment reflecting the updated standards and the implementation of the 120% limitation imposed by the legislature.

Wisconsin's standards of assistance in AFDC, exclusive of shelter, are set forth in tabular form on Attachment A. The base combined allowance was established on 7-1-67. The Health and Social Services Board approved an updated level beginning 7-1-69 which met the requirements of Section 402(a) (23). See footnote (b) for explanation.

Costs of shelter were to be added to this combined allowance on an as paid basis to a maximum if county policy were so established. This provided for an automatic updating of the shelter costs. This standard was not submitted pending action of the legislature on the budget bill providing the funding.

Section 49.19(11), created as part of Chapter 154, Laws of 1969, provides that the statewide average of money grants to persons on aid to families with dependent children, living with legally responsible relatives, shall not exceed 120% of the national average of such aid, as determined from federal statistics.

Because of the legislative mandate, the Department established a rated reduction of the updated combined allowance. This was done by first subtracting $8.00 per person (except for one person family) as shown in column III and then adding back in the combined allowance $8.00, $11.00 or $13.00 per family for certain common items from the special needs list. This is the first time an allowance for these common items has been included in the combined allowance. The current combined allowance is shown in column V on Attachment A and is the total of columns III and IV.

Finally then the current standard for the combined or basic allowance is shown in column V and represents the sum of the rated reduction in column III plus the allowance for common items shown in column IV.

In order to assure compliance with the legislative mandate of 120% of national average, it was necessary to place some control statewide on the costs of shelter. This was done by freezing the shelter allowance

to the amount paid September 1, 1969 and establishing a county standard for cases coming on AFDC subsequent to November. See Attachment B which describes in full the current AFDC standard and budgeting system.

We believe the foregoing together with the attachments fully meets SRS Program Regulation 20–7. If there are questions, we shall be happy to answer them.

Sincerely,

/s/ Frank Newgent, Administrator
 DIVISION OF FAMILY SERVICES

---

## ATTACHMENT A

## STANDARDS OF ASSISTANCE AFDC—WISCONSIN
(exclusive of shelter)

| Family Size | Combined Allowance 7–1–67 (a) | Updated Combined Allowance 7–1–69 (b) | Rated Reduction 11–1–69 | Amount for Common Items (c) | Current Combined (Basic) Allowance |
|---|---|---|---|---|---|
| | I | II | III | IV | V |
| 1 | $ 63 | $ 70 | $ 53 | $ 9 | $ 62 |
| 2 | 99 | 111 | 83 | 9 | 92 |
| 3 | 126 | 141 | 102 | 9 | 111 |
| 4 | 149 | 167 | 117 | 9 | 126 |
| 5 | 187 | 209 | 147 | 9 | 156 |
| 6 | 217 | 244 | 169 | 11 | 180 |
| 7 | 248 | 280 | 192 | 11 | 203 |
| 8 | 275 | 310 | 211 | 11 | 222 |
| 9 | 304 | 343 | 232 | 13 | 245 |
| 10 | 329 | 372 | 249 | 13 | 262 |
| 11 | 359 | 408 | 271 | 13 | 284 |
| 12 | 389 | 444 | 293 | 13 | 306 |

(a) Assistance standards were adjusted upward on 7–1–67 by 8% which was not up to Bureau of Labor Statistics cost of living level. Fuel and utilities were incorporated into the combined allowance for the first time.

(b) This is the updated level approved by the Health and Social Services Board which includes upward adjustments of 5.7% for food, 6.9% for personal need items, 7.3% for household supplies and 5.1% for fuel to the cost of living level as of September 1966. This also includes updating of nutritional level to the latest one.

(c) Common items were formerly treated as special needs. This is the first time there has been a statewide standard for such special needs plus the first time the cost has been incorporated into the combined allowance (now known as the basic allowance).